[Birmingham Railway, Light & Power Co. v. Drennen.]

# Birmingham Railway, Light & Power Co. *v*. Drennen.

## *Death Action.*

(Decided June 3, 1911. Rehearing denied February 17, 1912.
57 South. 876.)

1. *Negligence; Wanton Injury.*—Where an act is done or omitted under circumstances and conditions known to the person that his conduct is likely to, or will probably result in injury, and through reckless indifference to the consequences, or consciously or intentionally, he does the wrongful act or omits an act which he ought to have done, the injury inflicted is wanton.

2. *Street Railways; Injury to Traveller; Collision; Wanton Injury.*—The evidence in this case examined and held to require submission to the jury of the issues of wanton negligence, negligence and contributory negligence.

3. *Same; Instructions.*—Where a complaint stated two causes of action in different counts, against a street car company for the death of a traveller, one counting on simple negligence, and the other on wanton negligence, a charge that if the jury are reasonably satisfied that either one or the other counts was true plaintiff's case was made out, was not objectionable as directing a verdict for the plaintiff, or as ignoring pleas of contributory negligence.

4. *Same; Instructions; Form.*—Where the action was for death in a collision between decedent's carriage and a street car, a charge asserting that if the decedent pulled his horses on the track, and was guilty of contributory negligence in that regard, yet if the motorman saw the peril in time to have avoided injury by the exercise of due care, and negligently failed, after discovering the peril, to do what he could, in the exercise of due care in managing the car, and such negligence, if any, proximately caused the death, then decedent's negligence, if any, in getting into danger, would be no defense to the subsequent negligence of the motorman, even if the motorman was not guilty of wanton nor intentional wrong, was neither abstract, nor misleading.

5. *Appeal and Error; Harmless Error; Misconduct of Counsel.*—Where plaintiff's counsel, in arguing the case, referring to defendant's counsel said: "I know Hugh Morrow, and I know what I am going to say about him is true. I know that if he was on the jury trying this case, that he would render a verdict for the plaintiff in a large amount." Defendant's counsel objected and objection was sustained, but the court did not exclude the argument or reprimand counsel for using it, nor did defendant's counsel further move the court to exclude, but assigned the same as grounds for new trial. Held, that the argument was prejudicially erroneous, and that the court having failed to more forcibly exclude the same and repri-

[Birmingham Railway, Light & Power Co. v. Drennen.]

mand counsel, should have granted defendant a new trial on account of same.

6. *Jury; Disqualification; Boarders.*—Where the action was by the wife for the death of the husband, and one of the jurors was a boarder at her house, which fact was unknown to defendant at the time of or before the trial, such juror was disqualified, and the fact that he sat in the case was sufficient to vitiate the verdict.

7. *Inkeepers; Boarding House.*—An inn when unlicensed is distinguished from a boarding house in that the guests of a boarding house are under an express contract at a certain rate and for a specified time, and the keeper may select the guest and fix full term, while an inn is for the entertainment of all who come lawfully and pay regularly.

(Mayfield, J., dissents in part.)

APPEAL from Jefferson Circuit Court.

Heard before Hon. A. O. LANE.

Action by Kate D. Drennen, as administratrix, against the Birmingham Railway, Light & Power Company for damages for death of her intestate, alleged to have been caused by a collision with one of defendant's cars. Judgment for plaintiff in the sum of $7,000, and defendant appeals. Reversed and remanded.

The facts sufficiently appear from the opinion of the court. The oral charge of the court, excepted to, is as follows: "Willful injury exists where there is a purpose on the part of the party complained of to inflict the injury. Wanton injury does not necessarily include any design or purpose to injure any one; but if the person in charge of the car, which is being operated and run along a public street, knows that to run the car without stopping is liable to injure a person in front of the car, and if he is conscious of his conduct at the time, continued to run the car with a reckless indifference to consequences, without making proper efforts to stop it, or without using the means at hand to stop it, and prevent the collision, that would constitute wantonness, if the act or ommission to act was the proximate cause of the injury. You see, in will-

ful injury there must be design or purpose; whereas, to constitute wanton injury, there need not be a design to injure, but a reckless indifference to consequences, knowing at the time that the doing of certain acts, or failure to do certain acts, would result in personal injury or death, and he consciously does the act, or consciously fails to act, and such act, or failure to act, results in injury or death, that would constitute wantonness, if that act or failure to act was the proximate cause of the injury."

Charge 7 is as follows, and was given for the plaintiff: "Even if Mr. Drennen pulled his horse on the track, and was guilty of contributory negligence in that regard, yet if the motorman saw the peril in time to avoid the danger by the exercise of due care, and negligently failed after discovering the peril to do what he could in the exercise of due care in the management or control of the car, and that such negligent failure, if there was such, proximately caused the death, then the previous negligence, if any, of Drennen in getting into danger, would be no defense to such subsequent negligence of the motorman, even if the motorman was not guilty of any wantonness, nor of any intentional wrong."

TILLMAN, BRADLEY & MORROW, for appellant. The court erred in its oral charge to the jury on the question of wantonness, and in giving the charges requested by plaintiff.—*L. & N. v. Brown,* 121 Ala. ; 11 Enc. P. & P. 183. The written charges requested by defendant should have been given.—*B. R., L. & P. Co. v. Randle,* 43 South. 355; *A. G. S. v. Burgess,* 119 Ala. 550; *M. & M. R. R. Co. v. Blakey,* 59 Ala. 470. The court should have granted a new trial because of its failure to exclude remarks of counsel, and to reprimand him.—*E. T. V. & G. v. Bayliss,* 75 Ala. 470; *Woolf v. Minnis,* 74

Ala. 386; *Florence C. & I. Co. v. Fields*, 104 Ala. 472; *Anderson v. The State*, 104 Ala. 84. John Taylor was not an impartial juror, and the fact that he sat in the case vitiated the verdict.

BOWMAN, HARSH & BEDDOW, for appellee. The evidence justified the submission of the question of wantonness to the jury.—*So. Ry. Co. v. Shelton*, 136 Ala. 214; *Ensley Ry. v. Chewning*, 93 Ala. 24; *L. & N. v. Trammell*, 93 Ala. 350. Counsel discuss other assignments of error, but without citation of authority.

MAYFIELD, J.—Appellee, as administratrix, sued appellant street car company, under the homicide statute, to recover damages for the wrongful death of her intestate, who was her husband.

The complaint contained two counts; one charging simple negligence, and the other wantonness. The gravamen of the complaint is that the motorman in charge of the defendant's car, either negligently, as charged in the first count, or wantonly or intentionally, as charged in the second, caused the car to run against a buggy in which the intestate was riding, thus throwing him from the buggy, or causing him to jump therefrom, and thereby killing him.

The deceased, on the day of the fatal injury, was driving in a buggy on the north side of Avenue F., in the city of Birmingham, going in an easterly direction towards Avondale, while the defendant's car was proceeding in the opposite direction along the same avenue, and when at a point between Twenty-Second and Twenty-Third streets the horse of the deceased became frightened and unruly, and while deceased was attempting to control the animal the buggy was run into by the street car, or ran against the car.

The evidence is conflicting as to the exact manner of the collision; that is to say, whether the car was standing still at the time, and was struck by the buggy, or whether the car ran into the buggy. Some of the evidence shows that the car moved about six inches after the collision, and other evidence that it moved three or four feet, and still other that it moved six or eight feet. There was testimony tending to show that the deceased pulled the horse across the track in front of the car, or that the horse, becoming unmanageable, went across the track in front of the car, while deceased was trying to prevent it from so crossing. The deceased either was thrown, or jumped, from the buggy at the time of the collision, and it was from this fall that he received the injuries that caused his death.

The substance and effect of the testimony of the first witness for plaintiff, a negro woman named Willie Brown, was that she witnessed the collision and accident; that just before and at the time of the accident the motorman in charge of the car was looking backward, and therefore could not and did not see the deceased nor know of his peril. For what purpose he was looking backward was not made to appear by her evidence; and it should be said that her testimony here is contradicted by all the other witnesses. Moreover, she puts the deceased on the side of the track opposite to that indicated in the testimony of other witnesses, and stated that the deceased pulled the horse across the track to avoid meeting an automobile. None of the other witnesses testify to seeing an automobile, or to the circumstances of the crossing of the track. She says that the car did not slow up, because the motorman was looking backward. She does not say how far the car moved, after striking the buggy; but her testimony tends to show that the deceased pulled the horse across

the track in front of the car. Many of the witnesses say that the horse was shying or attempting to run, and that deceased was trying to keep it off the track at the time of the collision.

Another witness, Mrs. Connybear, testifies that she did not see the car strike the buggy; that when she first saw it the car was pushing the buggy toward Twenty-Fourth street, and went three or four feet. She does not attempt to show how close the car was to deceased when he went upon the track.

Another witness for the plaintiff, Mrs. Massey, testifies that she was in her house near the scene of the accident, and that she reached her door just in time to see the collision; that the car pushed the buggy about three feet.

Nellie Luna, another witness, testifies that the car had stopped when she first saw it, and that she did not see the collision.

Another witness for the plaintiff, Ed Shriver, testifies that he did not see the collision, but witnessed some of the circumstances; that the car was running at a moderate speed, he being in it, and that he did not see the buggy, until the collision; that he did not feel any crash, but only the usual sensation of a stopping car.

The defendant's witness Erhart testifies that the car was standing still, and that the buggy collided with it. Another witness, Hunter, testifies that the horse was trying to cross the track; the car being within six feet of it. Another witness testifies that he saw the horse jump across, about six feet in front of the car, and that the buggy hit the end of the car just about the time it got on the track.

Another witness, Miller, testifies that the horse shied across the track, and that the car was stopped after it

pushed the buggy about six inches, and that the horse was about 15 or 20 feet from the car.

Witness M. F. Oeser testified that the crash and the stopping of the car occurred at the same time, and that deceased was about 10 yards in front of the car when he fell.

The testimony of the witness Parker, the motorman, is to the effect that he noticed the deceased coming up the avenue, but not on the track, and that as the horse got closer to the car it became frightened at something on the sidewalk, and attempted to cross the track, the deceased trying to prevent this; and that he (the motorman) attempted to slow up the car as soon as he saw that the horse was trying to cross the track; that the car was still when the buggy struck it, and that the left hind wheel was knocked off; that the horse was going very fast; that the car was stopped by the time the horse was within 15 or 20 feet of it; that he had time to stop the car, but not to back it.

We do not find any evidence in this record, standing alone, or connected with all the other evidence, which would justify the trial court in submitting the question of wanton negligence or willful injury under the second count, which ascribed the injury to the wantonness, or willfulness of the motorman. While some of the evidence may tend to show simple negligence on the part of the motorman, we find none showing, or even tending to show, wanton negligence or willful injury, as has been defined by this court. The most that any of it shows or tends to show is that he was looking backward, and therefore failed to observe the danger to which the deceased was exposed, or to know and appreciate the danger of not stopping the car. There is nothing to show that his looking backward was wanton, or to justify any inference that it was with the intent

to injure the deceased or any one else. The most that this or any other evidence shows is simple negligence, or failure to observe due care. Other evidence shows that he failed to sound the gong, or to give warning of the approach of the car; but this, at most, was simple negligence, and all the other evidence shows or tends to show that he did attempt, as best he could, to prevent the injury, after becoming aware of the danger and peril of the deceased.

It follows, therefore, that the court should have given the affirmative charge for the defendant, as requested, as to the count charging wantonness or willful injury. Wanton negligence or willful injury has been often defined by this court; and those phases of it applying to this case have been stated by this court as follows:

When an act is done or omitted under circumstances and conditions, known to the person, that his conduct is likely to or probably will result in injury, and through reckless indifference to consequences, or consciously and intentionally, one does a wrongful act, or omits an act which he ought to have done, the injury inflicted may be said to be wanton. In such cases, it is, however, essential that the act done or omitted should be done or omitted with a knowledge and present consciousness that injury would probably result; and this consciousness is not to be implied from a mere knowledge of the dangerous situation.—*M., J. & K. C. R. C. Co. v. Smith,* 153 Ala. 127, 45 South. 57, 127 Am. St. Rep. 22.

In order that one may be held guilty of willful or wanton conduct, it must be shown that he was conscious of his conduct and conscious, from his knowledge of existing conditions, that injury would likely or probably result from his conduct, and that, with reck-

less indifference to consequences, he consciously and intentionally did some wrongful act, or omited some known duty, which produced the injurious result.— *Montgomery St. Ry. Co. v. Rice,* 144 Ala. 610, 38 South. 857.

Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct, and conscious from his knowledge of existing conditions, that injury would likely result from his conduct; that, with reckless indifference to consequences, he consciously and intentionally did some wrongful act, or omitted some known duty, which produced the injury.—*Peters v. Southern Ry. Co.,* 135 Ala. 537, 33 South. 332. See *M. & C. R. R. Co. v. Martin,* 117 Ala. 367, 23 South. 231; *Burson v. L. & N. R. R. Co.,* 116 Ala. 198, 22 South. 457; *Birmingham Co. v. Bowers,* 110 Ala. 328, 20 South. 345.

Where there is no evidence of knowledge on the part of the engineer of the presence or peril of the person on the track, or knowledge from existing conditions at the time and place of the accident that injury would likely or probably result to such person from the speed at which the engineer was running the train, he could not be said to be guilty of wanton negligence.—*Peters v. Southern Ry. Co., supra.*

The running of a train at a dangerous rate of speed through an incorporated city or town, or across a public highway along which persons in large numbers are continually passing, and without sounding the whistle or ringing the bell, or giving any alarm, does not necessarily involve an intention to kill, or such reckless disregard as to probable consequences as to amount to wantonness.—*L. & N. R. R. Co. v. Mitchell,* 134 Ala. 266, 32 South. 735; *L. & N. R. R. Co. v. Orr,* 121 Ala. 489, 26 South. 35.

It is only after those who are operating a train fail to exercise reasonable care to avoid injuring a trespasser, after he is discovered and his peril becomes apparent, that they are held to be guilty of wantonness or recklessness, such as to overcome contributory negligence of the trespasesr.—*L. & N. R. R. Co. v. Mitchell*, 134 Ala. 266, 32 South. 735; *Haley v. K. C., M. & B. R. R. Co.*, 113 Ala. 649, 21 South. 357.

It is essential, to constitute wanton negligence, that the act done or omitted should be done or omitted with a knowledge and a present consciousness that injury will probably result, and this knowledge is not to be implied from mere knowledge of elements of the dangerous situation.—*L. & N. R. R. Co. v. Brown*, 121 Ala. 221, 25 South. 609; *Burgess' Case,* 114 Ala. 587; 22 South. 169; *Markee's Case,* 103 Ala. 160, 15 South. 511, 49 Am. St. Rep. 21; *Swope's Case,* 115 Ala. 287, 22 South. 174; *Burgess' Case,* 116 Ala. 509, 22 South. 913.

A mere error of judgment, or omission to act, without more, cannot rise to the degree of wanton negligence or willful wrong.—Authorites supra; *Georgia Pac. R. Co. v. Lee,* 92 Ala. 272, 9 South. 230; *Louisville & N. R. Co. v. Webb,* 97 Ala. 308, 12 South. 374; *Highland Avenue & Belt R. Co. v. Sampson,* 91 Ala. 560, 8 South. 778.

When a person is killed on the side track by a backing train moving at the rate of from three to six miles per hour, the fact that a proper lookout was not kept, or that the bell was not rung, held, as a matter of law, not to be wanton negligence.—*L. & N. R. R. Co. v. Richards,* 100 Ala. 366, 13 South. 944.

On further consideration of this case, on the application for a rehearing, the majority of the court are of the opinion that the trial court did not err in submitting the question of wantonness to the jury, and there-

[Birmingham Railway, Light & Power Co. v. Drennen.]

fore do not agree to what is said by the writer on the subject of wantonness. The writer, however, adheres to the views above expressed upon this subject. He has read the evidence—every word of it—and he fails to find any tendency therein to show wantonness; and the only evidence he finds, tending to show simple negligence, is that going to show that the motorman was looking backward, and not forward, when the accident occurred. This would repel any idea of wantonness or willfulness, and show, at most, but inattention. There is, in his opinion, not a syllable of the other testimony that tends to show negligence, and nothing in the entire evidence, excepting this testimony as to the motorman's looking backward, but what would show the accident to have been an unavoidable one, for which no one would be liable. The questions of simple negligence on the part of the motorman, and contributory negligence on the part of the deceased, were matters for the jury. The court did not err in submitting these questions to the jury, nor in declining to instruct the jury affirmatively for the defendant upon these issues.

We find no reversible erorr in those parts of the oral charge to which exceptions were reserved by defendant. They assert correct propositions of law, and when, referred to the whole charge of which they are parts, we cannot say that they were misleading, certainly not so, to the extent to justify a reversal. The defendant could and should have requested explanatory instructions which would have cured the charges of any possible misleading tendencies.

There was no error in charging the jury that, if they were reasonably satisfied from the evidence that either one or the other of the counts of plaintiff's complaint is true, then plaintiff's case is made out. This is undoubtedly the law, as has been many times said by this and

other courts. It did not request a verdict for plaintiff, and therefore did not ignore the pleas or defense as to contributory negligence; and, besides, the court, at the request of the defendant, gave an explanatory charge, curing it of any misleading tendency.

There was no error in giving charge No. 7. It stated a correct proposition of law, and it was neither abstract nor misleading; but, even if it were, we would not reverse for these faults, if otherwise correct. We have repeatedly ruled that there is no error in refusing charges which instruct the jury that there is no evidence of a given fact.

The bill of exceptions contains the following recitals: "Mr. Harsh, in making the closing argument for the plaintiff in the case, said to the jury: 'I know Hugh Morrow, and I know what I am going to tell you about him is true. I know that if he was on the jury trying this case that he would render a verdict in favor of the plaintiff in a large amount.' The defendant, by its attorney, Hugh Morrow, who tried the case, objected to the foregoing argument of plaintiff's counsel, and the court sustained the objection. At the time of making the objection, defendant's attorney stated to the court, in the presence of the jury, that the facts stated by Mr. Harsh were not in evidence, and were not true in substance and in fact." This was clearly and wholly illegitimate argument. It was matter stated as a fact to the jury, of which there was no evidence, and of which fact evidence would not have been admissible, if offered. Its only tendency and effect was to prejudice the jury against the defense of the defendant, and against the sincerity of its counsel in so defending. Its natural tendency was to persuade the jury to render a verdict for plaintiff, because it was practically confessed by the attorney for defendant. It would be difficult to

conceive of argument more objectionable, unfair, and prejudicial than was this, coming, as it did, in the closing argument, to which the defendant's counsel has no opportunity to reply. Courts should not allow verdicts obtained by such argument to stand. If the trial court had been requested to exclude the argument from the jury, and had declined, there would, we think, be no doubt that the refusal would be reversible error on appeal, or that it would be ground for a new trial. The defendant's counsel did object to the argument, and the court sustained the objection, but the court did not ex mero motu exclude such argument, or reprimand counsel so using it; nor did counsel retract it after it was objected to and the objection sustained; nor did counsel for defendant, as he might have done, further move the court to exclude. This court, on appeal, can only review the actions and rulings of the trial courts, and not those of counsel; hence on the main appeal we cannot review the action of the trial court as to this matter, for the reason that his ruling, as far as invoked on the main trial, was in favor of appellant, and appellant cannot therefore assign it as error.—*Cutcliff's Case,* 148 Ala. 108, 41 South. 873; *Strone's Case,* 105 Ala. 60, 72, 17 South. 114; *King's Case,* 100 Ala. 85, 14 South. 878.

But the defendant could and did assign, as ground for new trial, this illegitimate argument of plaintiff's counsel, which argument counsel failed to withdraw, or to attempt to correct the erroneous impression it may have produced upon the minds of the jury, and the trial court declined to set aside the verdict on this account; so, as to the new trial, it may assign such action as error.

This court has repeatedly and in strong language condemned remarks of counsel less offensive and less offending than those used in this case, and has awarded

new trials where the trial court failed or refused to take prompt and decisive action to eradicate such erroneous impressions, and has done this in cases even where counsel making such argument had done all he could to cure his error; that is, by retracting the offensive remarks.

In the case of *Wolffe v. Minnis*, 74 Ala. 286, 389, this court, by STONE, C. J., said: "We think the language complained of in this case should not have been indulged, and coming, as it did, from able and eminent counsel, it was well calculated to exert an improper influence on the minds of the jurors. The court might, and probably should, have arrested it ex mero motu. It is one of the highest judicial functions to see the law impartially administered, and to prevent, as far as possible, all improper, extraneous influences from finding their way into the jury box. And when opposing counsel objected to the improper language employed, and called the attention of the court to it, it was not enough that offending counsel replied, 'Oh, well, I'll take it back.' Such remark cannot efface the impression. The court should have instructed the jury, in clear terms, that such remarks were not legitimate argument, and that they should not consider anything thus said in their deliberations. Nothing short of a prompt, emphatic disapproval of such line of argument, and that from the court itself, can avert the probable mischief.—*Sullivan v. State*, 66 Ala. 48; *Cross v. State*, 68 Ala. 476." This quotation is strikingly applicable to this case.

In the case of *Florence, etc., Co. v. Field*, 104 Ala. 471, 480, 16 South. 538, 540, this court, commenting on improper remarks of counsel, speaking by Justice HARALSON, said: "On objection raised by defendant's counsel, the court said the objection was sustained, and stated to counsel making the remark that it was im-

proper, whereupon the said counsel remarked, 'Well, I withdraw the remark.' There was no exception reserved by defendant to this remark of counsel, nor to the action of the court upon it. Nor is it made the basis of a motion for a new trial. It is, however, assigned as error. We have referred to it to state that the remark was calculated · to seriously prejudice and injure the defendant with the jury. The action of the court in excluding it was very mild, and not a sufficient antidote to the poison that had been injected into the minds of the jury by the use of such language. Verdicts ought not to be won by such methods, and when an attorney, in the heat of debate, goes to such extraordinary lengths generally the court should promptly set aside any verdict that may be rendered for his client. The repressive powers of a court to prevent such departures from legitimate argument of a cause before a jury should be vigorously applied. No mere statement that it is out of order or improper can meet the exigencies of the case. Nothing short of such action on the part of the court, and a clear satisfaction that the prejudice naturally excited by the use of such language had been removed from the minds of the jury, ought ever to rescue a case from a new trial on motion of the party against whom rendered."

In the case of *Tannehill v. State,* 159 Ala. 52, 48 South. 622, this court, speaking through SIMPSON, J., said: "It is the duty of the court to see that the defendant is tried according to the law and the evidence, free from any appeal to prejudice or other improper motive; and this duty is emphasized when a colored man is placed upon trial before a jury of white men. Courts in some other jurisdictions have held, on what seems to be good reason, that the injury done by such remarks cannot even be atoned by the retraction or the ruling out of the

remarks; but at least it is error, as held by our own courts, for such remarks, stating facts that are not in evidence before the jury, to be allowed."

In the case of *Berry v. State,* 10 Ga. 511, 522, when the question was raised for the first time on motion for new trial, Lumpkin, J., made the following pungent remarks: "That the practice complained of is highly reprehensible, no one can doubt. It ought, in every instance, to be properly repressed. For counsel to undertake by a side wind to get that in as proof which is merely conjecture, and thus to work a prejudice in the minds of the jury, cannot be tolerated. Nor ought the presiding judge to wait until he is called on to interpose. For it is usually better to trust to the discrimination of the jury as to what is, and what is not, in evidence than for the opposing counsel to move in the matter. For what practitioner has not regretted his untoward interference, when the counsel, thus interrupted, resumes: 'Yes, gentlemen, I have touched a tender spot; the galled jade will wince. You see where the shoe pinches.' "

In the case of *East Tennessee, Virginia & Georgia Railroad Co. v. Carloss,* 77 Ala. 443, 448, this court, through SOMERVILLE, J., said: "As the case is sent back for a new trial on another point, we need not consider whether the exception was properly taken so as to raise this question. Circuit judges have ample power to check arguments of this character by setting aside verdicts obtained through their influence, either on motion of the adverse party or ex mero motu. If it were exercised more freely in such cases, this court would probably be troubled with reviewing fewer transgressions of the rule to which we have above referred."

We are also of the opinion that a new trial should have been awarded because of the disqualification of the

juror Taylor, who was shown to be boarding at the house of and with the plaintiff at the time of the trial. He was either the guest, the tenant, or a member of the household of the plaintiff at the time of the trial, either of which relations would disqualify him as a juror. It was not disputed, but admitted, that this fact was unknown to the defendant or its attorney at the time of or before the trial. It could not be expected, under the circumstances shown in this case, that the juror would be disinterested and unbiased as between the parties. Here was a juror whose landlady was the plaintiff, and a witness at the trial, insisting that this defendant had wrongfully killed her husband and left her a widow. It would have been inhuman and wholly unnatural that this juror could be entirely uninfluenced by these facts. The trial lasted for several days, and he was rooming at the plaintiff's house and home during this time, and had been doing so for some time before the trial. The plaintiff certainly knew this fact before and at the time of the trial, and it is admitted that the defendant did not. The juror or the plaintiff should have disclosed this fact to the court or to the defendant, so that the juror could be challenged or excused. However honest and conscientious the juror may have been, he was not a proper juror on this trial under his existing environments. Without committing ourselves to all that Mr. Proffatt (Jury Trial, § 177, p. 231) says, we quote: "Social or business relations existing between a juror and a party to the suit render the juror incompetent. As when the juror is under the power of either party, or in his employment, or has drunk or eaten at his expense, since the commencement of the action. Hence the relation of landlord or tenant disqualifies." Mr. Thompson ('Trials, vol. 1, § 67, p. 59), says: "That the venireman is the inferior or dependent in business

relations of the opposite party to the suit will generally disqualify. Thus, if he is his surety, and the rendition of a judgment against him will diminish the probability of his being exonerated, or if he is his tenant, although distress for rent may have been abolished," etc.

While it has been held that the fact that one of the parties is an innkeeper and that one of the jurors is stopping at his inn will not disqualify him; this is quite different from a private boarding house, such as that shown in this case. The relation shown in the case at bar is much closer than that between ordinary landlord and tenant, or between the landlord and a mere patron of a public hotel. The distinction between a public inn or hotel and a boarding house is well pointed out in the case of *Foster v. State,* 84 Ala. 452, 4 South. 833, where it is said: "An 'inn' is a house of entertainment for travelers, being synonymous in meaning with 'hotel' or 'tavern.' It was formerly defined to mean 'a house where a traveler is furnished with everything which he has occasion for while upon his way.'—*Thompson v. Lacy,* 3 B. & Ald. 283; *People v. Jones,* 54 Barb. (N. Y.) 311. But this definition has necessarily been modified by the progress of time, and the mutations in the customs of society and modes of travel in modern times. An inn, however, was always, and may now, when unlicensed, be distinguished from a boarding house, the guest of which is under an express contract, at a certain rate, and for a specified time; the right of selecting the guest or boarder and fixing full terms being the chief characteristic of the boarding house, as distinguished from an inn, etc.

So, in the case of *City of Birmingham v. Birmingham Waterworks Company,* 152 Ala. 310, 44 South. 582, 11 L. R. A. (N. S.) 613, the distinction is drawn; it being there said: "The public house is for the entertainment

of all who come lawfully and pay regularly. The boarding house is for the accommodation of those only who are accepted as guests by the proprietor. Such an establishment is as much a private house as if there were no boarders.    *    *    *"

"In a boarding house, the guest is under an express contract, at a certain rate, for a certain period of time; but in an inn there is no express engagement. The guest, being on his way, is entertained from day to day, according to his business, upon an implied contract," etc.

In the case at bar, the juror was not only a tenant of the plaintiff, but a member of her household; and it is wholly improbable that he could have been indifferent to the result of the suit. His testimony, on the motion for a new trial, while showing that he was not in favor of returning as large a verdict as some of the other jurors favored, yet shows that he resolved his doubts as to whether the case was made out in favor of the plaintiff. As to this, he says: "Yes; and my recollection is myself and two other gentlemen were the lowest gentlemen on that jury for a verdict. I took a very firm stand, as I saw the case, that I wasn't in favor of an excessive or any large verdict; in my mind, there was a question of doubt about it, and I was willing to give plaintiff the benefit of it."

We are of the opinion that the trial court should have granted the motion for a new trial, and that it was error to refuse it.

Reversed and remanded. All the Justices concur, save Dowdell, C. J., not sitting, and Mayfield, J., who dissents as to the question of wantonness being for the jury.