(129 So. 787)

### POINTER v. STATE.
### 7 Div. 614.

Court of Appeals of Alabama.
Aug. 19, 1930.

Charlie C. McCall, Atty. Gen., for the State.

BRICKEN, P. J.

The appellant was tried on an indictment charging him with murder in the first degree. The jury returned a verdict of guilty of manslaughter in the first degree. A motion for a new trial was overruled, and the appellant assigns as error the overruling of the motion, as well as various rulings during the trial.

The evidence tended to show that the deceased, Phillips, in company with one Pinson (both Phillips and Pinson being enemies of appellant and not on speaking terms with him), waited at a point where he had to pass when returning from his work to his home, and that the deceased, Phillips, accosted Pointer about a controversial matter and barred Pointer's way, refusing to let him pass when Pointer tried to continue on toward his home. A difficulty then ensued between the two men, in the course of which appellant was severely injured, by having

Bibb, Field, Field & Woolf and Knox, Acker, Sterne & Liles, all of Anniston, for appellant.

been beat over the head with a pistol, as a result of which he was drenched with his own blood. The combatants, in their struggle, moved from the point of original encounter to a point some 70 feet away, where the struggle terminated by the firing of the pistol shots that killed Phillips. The pistol was fired so close to Phillips that his clothing was set on fire.

The defendant's testimony tended to show that he was unarmed when accosted by deceased; that deceased produced a pistol and fired at the defendant, whereupon the two men grappled; and that, in the encounter, Pointer finally succeeded, in the course of a desperate hand-to-hand struggle, in turning upon Phillips the latter's own pistol. The pistol with which Phillips was shot was a Colt's pistol, No. 70250. The defendant's evidence tended to trace the history of the pistol from the factory of the Colt Manufacturing Company through the hands of a number of owners, and showed that it was sold to Phillips about a year before the affray. The widow of the deceased, however, denied that the pistol belonged to him.

The appellant excepted to numerous rulings of the trial court, and assigns as error a series of arguments, statements, questions, and offers to prove, made in the presence of the jury, as to matters which the appellant avers were highly prejudicial to him. The appellant argues that "there were several of these occurrences, each sufficient in and of itself to necessitate a reversal, and that the entire series of such matters, taken as a whole, created a general atmosphere of prejudicial and improper suggestions and statements to the jury, grossly invasive of his right to a legal trial."

Among the complaints so made by the appellant are the following, as stated by him:

"1. In the opening of the case, the solicitor attempted to prejudice the defendant by criticising as unusual the action of his counsel in stating the issues to the jury.

"2. The solicitor, in the presence of the jury, during the examination of one of the State's witnesses, stated that this witness 'very generously' admitted that he was not on speaking terms with Pointer.

"3. The solicitor stated, in the presence of the jury, that he (the solicitor) had been to the scene of the homicide, and knew that there were no high weeds there.

"4. The solicitor attempted to prejudice the defendant by showing that he was on bad terms with his nearest neighbor. After the court had sustained an objection to this question, he stated, 'I will try to get it this way; I am determined to have it.' After the court stated to the jury that this was excluded, the solicitor, in the hearing of the jury, said, 'but you can't exclude him from doing it.'

After the court sustained the motion to exclude that statement, the solicitor then stated, 'such stuff as that is tom-foolishness.'

"5. Upon the court's giving the defendant's counsel permission to speak to a witness on the stand, one of the prosecuting attorneys stated, in the presence of the jury, 'looks like they are giving him the third degree to me.' When objection was made to this remark, this prosecuting attorney stated, in the presence of the jury, 'well, the jury can tell as well as I can.' Objection was made to this statement, and the prosecuting attorney then said, 'that is all right. I have seen it done lots. I just never did do it.'

"6. One of the prosecuting attorneys argued that the jury should find that a certain blow on the head was sufficient to cause death because the witness Usrey had been quoted as making that statement out of court. Thereupon, the court instructed the jury that there was no evidence that such wound would produce death, and that they could not draw such an inference from Usrey's statement. Thereupon, the prosecuting attorney stated to the jury, 'Mr. Usrey is an undertaker, and is supposed to know the anatomy of a human body.' Objection was made to this. The court inquired whether there was any evidence in the record that Usrey was an undertaker, to which the prosecuting attorney replied, 'I don't know, your Honor. I just knew that he was an undertaker'—as a matter of fact, there being no such evidence in the record.

"7. The solicitor attempted to have the jury convict because of the defendant's bad reputation, arguing to them that there were many good witnesses testifying to the character of a certain State's witness, but no witness to testify to the good character of the defendant, and stating to the jury that when a defendant is on trial, 'you want to try him according to his past and what is his record.'

"8. The special prosecuting attorney stated to the jury, in his argument, that he and the solicitor had talked to all the witnesses in the case and had carefully deliberated over what witnesses to put up. When the court sustained an objection to this statement, the prosecuting attorney then made the statement to the jury, 'I will state to you, gentlemen of the jury, that no witness was put on the stand without our knowing what he was going to swear.'

"9. One of the prosecuting attorneys, after the court had ruled that a certain argument by him was illegal, stated, 'let it go out, your Honor; I can argue this case without distressing these gentlemen.'

"10. The solicitor, in his closing argument, undertook to prejudice the defendant by commenting on objections defendant had made to the court, and a motion which de-

fendant had made to the court to reprimand the special prosecutor, the solicitor using the following language: 'It is the first time in my life, and I hope it will be the last time, I have ever seen a distinguished man, a man whose life has been approved, who has been your Circuit Judge, called on to humiliate himself before a jury.'"

In addition to the instances above set forth, which the appellant urges as showing a general course of prejudicing his rights by presenting to the jury illegal matter through the medium of improper arguments, side remarks to the jury, insinuations, etc., there is one occurrence which needs to be dealt with specifically. The state produced as a witness one Carroll, who testified to certain things which he had seen shortly after the homicide. On cross-examination, he testified to certain facts very favorable to the defendant. Thereupon, on redirect examination, the witness was asked the following question by the special prosecutor: "You have been in the penitentiary for stealing a horse, haven't you?" The defendant objected to the question, and the objection was sustained. Thereupon, in the presence of the jury, the prosecuting counsel said: "We offer to prove, if the court please, that this man was sent to the penitentiary for stealing a horse." When this occurred, the defendant asked that the jury retire, and moved the court to grant a mistrial, on the ground that gross and ineradicable prejudice had been done his case by the asking of this question and the making of the offer to prove in the presence of the jury. The court overruled the motion, and the defendant excepted. The defendant assigned this ruling as one of the grounds of his motion for a new trial, and also assigned the wrong and prejudice alleged to have been done him by the asking of this question and the statement as to the offer to prove.

Upon the most elementary principles, it is manifest that this occurrence requires the setting aside of the verdict. In the entire field of our jurisprudence it would be difficult to find two principles of law so well settled and so familiar to the legal profession as the rule that a party cannot impeach his own witness, and the rule that the state cannot appeal from a verdict of acquittal in a criminal trial. Therefore there can never be a legitimate function for an offer to prove, made by the state, in the presence of the jury, after an objection to the solicitor's question has been sustained. This illegitimate impeachment of a state's witness whose testimony on cross-examination had been very favorable to the defendant wrought vital prejudice to the defendant's case.

A somewhat similar occurrence was held for reversal in Brasher v. State, 22 Ala. App. 79, 112 So. 535, 536. In that case the solicitor, on cross-examining a witness for the defendant, asked him if he had not pleaded guilty of making liquor. Objection was sustained to the question, and the solicitor stated that he offered to introduce the record of the circuit court, showing a plea of guilty. For this, the judgment was reversed, the court saying:

"Derogation of an adverse witness and the evidence given by him should not be attempted or indulged in by resort to illegal method of practice. The solicitor must have known that this character of impeachment is not allowed or authorized by any rule of evidence known to the law. Its only effect was to produce an unfavorable impression of the witness before the jury, and thereby, in this unauthorized manner, lessen the weight of the witness' testimony, and impair his credibility before the jury."

It will be noted that the invasion of the defendant's right in the instant case was greater than in the Brasher Case. In the latter case, the solicitor was assailing the credibility of a witness for the defendant. In the case at bar, the attack was on the credibility of the state's own witness.

Reverting to the various arguments and statements which the appellant assigns as showing a general course of prejudicial appeal to the jury, and as creating a general atmosphere of illegal presentation of facts, etc., it is not necessary to consider whether any one or more of these occurrences, if standing alone, would require a reversal. We content ourselves with stating that, as to several of these, a serious question would be presented on the single occurrence, even if it were not accompanied by many other such occurrences throughout the trial. While, in most of the instances, the court sustained the defendant's objections and granted his motions to exclude, these occurrences were so numerous, and in many instances evidenced such persistence of effort to present to the jury facts held illegal by the court, that they could not have failed to prejudice the defendant.

In the very recent case of Birmingham Baptist Hospital v. Blackwell, 128 So. 389, 392, the Supreme Court condemns an attempt to circumvent the rules of evidence by a course of action which persistently invites the jury to consider illegal matter, and which creates a "general atmosphere" prejudicial to the securing of a trial on legal issues. Says the court:

"It is the generally accepted rule that it will constitute grounds for a new trial if counsel, in disregard of the court's ruling that a certain line of evidence is inadmissible, persists in attempting to get such evidence before the jury to the prejudice of the unsuccessful party, 20 R. C. L. p. 235; 26 R. C. L. p. 1021; 38 Cyc. p. 1478. * * *

" 'In a case like that here presented, where counsel persistently pursues a line of interro-

gation which the court rules to be wrong, and which one reasonably well acquainted with the rules governing the admission of evidence must know to be improper, the conclusion is irresistible that it is done for the purpose of influencing and prejudicing the minds of the jury in arriving at a verdict.' * * *

"It is now the well-established rule that, if improper argument of counsel is of such a character as to fall within that class of argumentative statements which are grossly improper and highly prejudicial, and whose evil influence and effect cannot be eradicated from the minds of the jury by any admonition from the trial judge, then a motion for a new trial is due to be granted."

In Whitfield v. State, 21 Ala. App. 490, 109 So. 524, 525, it is said: "To willfully, knowingly, and insistently endeavor to inject into a case matters wholly illegal and inadmissible, in order to fasten a conviction upon a person charged and on trial for a criminal offense, should not be indulged and cannot be approved or condoned."

■ The practice of injecting illegal considerations into a trial through the medium of improper arguments, statements, side remarks, and intimations calculated to influence the jury, has many times been condemned by appellate courts of this state. No holding can be too emphatic, or too solemn, that such invasions of the rights of parties in civil and criminal cases cannot be tolerated by courts charged with the duty of securing to all litigants trials which are lawful, impartial, and fair, both in form and in substance. No court should hesitate to set aside a verdict in a case where damaging testimony was delivered against objection by an incompetent witness—say a convicted perjurer. The invasion of the rights of the litigant is just as great and just as injurious where side remarks or illegal arguments convey to the jury ineradicable information of a damaging nature. When a trial attorney attempts to lay illegal matter before a jury, he must know that he is presenting to their consciousness something which it is always difficult, and often impossible, to eradicate from their minds; and such conduct cannot have the approval of this court.

After the defendant was convicted, his counsel learned, for the first time that one of the jurors had contributed to a fund to be used for the purpose of employing counsel to assist in prosecuting him for this homicide. Neither the defendant nor any of the attorneys in the case knew this until after the conviction. The defendant assigned the disqualification of this juror as one of the grounds of his motion for a new trial.

■ It is well settled that the grounds for disqualification enumerated in the statute are not exclusive, and that any other ground which indicates probable prejudice will disqualify a juror. Birmingham R., L. & P. Co. v. Drennen, 175 Ala. 338, 57 So. 876, 881, Ann. Cas. 1914C, 1037, and cases cited. The judgment in the case of Birmingham R., L. & P. Co. v. Drennen was reversed by the Supreme Court of Alabama because the trial court failed to grant a new trial upon proof that one of the jurors boarded at the house of the plaintiff. In that case the court said: "It could not be expected, under the circumstances shown in this case, that the juror would be disinterested and unbiased as between the parties. * * * However honest and conscientious the juror may have been, he was not a proper juror on this trial under his existing environments."

■ If a new trial should be granted in a civil case, where the juror's environment indicates probable prejudice, manifestly a new trial must be granted a defendant whose life or liberty has been at stake before a juror who is so environed as to be incapable of granting him an impartial trial. It cannot be doubted that in the instant case the juror who had contributed his money to employ counsel in an effort to convict the defendant could not accord him an impartial hearing. The rule is thus expressed by the Supreme Court of Florida in Blackwell v. State, 76 Fla. 124, 79 So. 731, 737, 1 A. L. R. 502: "A person who employs or contributes money for the employment of an attorney to represent one side of a cause, must necessarily believe in the justice of that side, which he so greatly desires to have prevail that he is willing to contribute money towards its success, and is not unbiased or without prejudice. One of the surest tests of a man's belief in and devotion to a cause is his willingness to contribute money for its success, and it would be a mockery of justice to permit such a person to insure that success by serving as a juror in the cause."

To the same effect are the cases of Commonwealth v. Moore, 143 Mass. 136, 9 N. E. 25, 58 Am. Rep. 128, and State v. Moore, 48 La. Ann. 380, 19 So. 285, 287, in which latter case the court uses the following language: "In the attitude of the contributor, it must seem difficult to maintain his fitness as a juror in a case the prosecution of which has enlisted his zeal, so distinctly manifested by his money contribution."

The impossibility of securing a fair trial at the hands of a juror who has contributed his money to further the prosecution is so manifest that the commentator in 1 A. L. R. 519, points out that few such cases have arisen, because, doubtless, there has been universal recognition of the utter disqualification of such a juror. The commentator uses the following language: "There are few reported cases dealing with the question of contributors to a fund for the prosecution of the par-

ticular case in which the question of disqualification arises, but such of the cases as have passed on this question consistently hold that the juror is disqualified, and it is reasonable to suppose that the question has not appeared oftener in the reports, because of a general recognition of the impropriety of permitting such contributors to serve on the jury."

In the instant case the defendant, upon learning of the disqualification of the juror, assigned the same as a ground of his motion for a new trial. This was the proper course, and the only course open to him. Having no knowledge of the disqualification of the juror, nor even reason to suspect such disqualification, he could not protect himself by examination of the veniremen. This case is, of course, manifestly distinguishable from cases in which a defendant, knowing in advance of the disqualification, has waived it by failing to make objection to the juror, or cases in which, upon discovering the disqualification before the conclusion of the trial, the defendant has invoked the wrong remedy, such as asking the privilege of remodeling the jury panel. This ground of the appellant's motion for a new trial was well taken.

Numerous other questions are presented upon this appeal, but, as the judgment of conviction appealed from must be reversed for the errors above indicated, there is no necessity to discuss this case further.

Reversed and remanded.

