435 So.2d 167 (1983)
Thermon JETTON
v.
STATE.
8 Div. 501.
Court of Criminal Appeals of Alabama.
March 29, 1983.
Rehearing Denied May 3, 1983.
Certiorari Denied July 22, 1983.
C.B. Caine, Jr., Moulton, for appellant.
Charles A. Graddick, Atty. Gen. and Helen P. Nelson, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 82-759.
HARRIS, Judge.
Appellant was indicted by the Lawrence County Grand Jury for the murder of June Way, also known as June Way Vinson. Appellant was arraigned on July 11, 1980, *168 where he entered a plea of not guilty and not guilty by reason of insanity. Subsequently a motion for mental examination was filed which was granted. After completion of the mental examination at Bryce Hospital, appellant was certified as being able to stand trial and was returned to Lawrence County. The trial commenced on December 8, 1980, and on December 11, 1980, after more than eight hours' deliberation, the jury returned a verdict of guilty of murder. On December 22, 1980, appellant was sentenced to thirty years' imprisonment in the state penitentiary.
The State presented evidence that the nude body of June Way Vinson was found on May 22, 1980, near a dirt road in front of the house where she and appellant had resided for several years. She had more than 100 bruises on her body, her breastbone and cheekbone were broken and she had internal injuries. An analysis of her body indicated that she was highly intoxicated when killed.
On May 21, 1980, the day before the body was found, the State's evidence showed that appellant had been drinking heavily with neighbors at his house. On that day, while at appellant's home, one of the neighbors noticed that the victim had a black eye, and, after the neighbor asked the appellant not to hit the decedent any more; the appellant became angry and shoved the neighbor to the floor.
Other neighbors testified that on the night of May 21, 1980, they heard voices from the direction of the appellant's house. One of the witnesses recognized appellant yelling and cursing at someone to "get up" and that it sounded as if appellant had said "June." The witnesses later heard moaning noises.
The State called a number of witnesses who saw appellant the morning of May 22, 1980, and who talked with him. On this morning, appellant had left his house, was seen walking on a local road, and was later taken to a friend's house.
Appellant's daughter testified that appellant told her on the morning of May 22, 1980, that he had hit the victim with a rock and had "left her lying there." This same day another witness heard appellant say, "I'm in bad trouble," and that he had killed a woman and she was lying out in the back yard. Appellant also told one of the witnesses that he had stomped the victim to death.
The State introduced the clothing appellant was wearing the morning the body was found. The clothing was bloodstained, and a serologist testified that the blood on the clothes matched the victim's blood.
The defense mainly focused on appellant's acute alcoholic problem and whether he was suffering from a mental disease or defect. A number of witnesses who knew appellant testified that he was a heavy drinker and he would often go on long alcoholic binges. One witness who was with appellant on May 21, 1980, testified that, in his opinion, at the end of this particular day appellant could not tell right from wrong, was "crazy drunk" and "staggering drunk." He also testified that, after he asked appellant for $10 back that he had given appellant one-half hour earlier, appellant became uncharacteristically hostile and apparently did not remember taking the money. Another witness testified that he had heard that appellant had drunk various substances such as rubbing alcohol and after-shave lotion.
Appellant testified that he had been drinking since he was thirteen years old and that, by the time he was 25 years old, he began drinking paint thinner when he was low on money. His alcoholism became more and more acute until he would go on binges for weeks at a time and he was forced to separate from his wife because of his drinking problem. He also began drinking such substances as rubbing alcohol, cooking sherry, after-shave lotion, and Right Guard deodorant.
Appellant testified that on occasions he would suffer from delirium tremens, or "d.t.'s," and would have to be hospitalized. He stated that he was in numerous alcoholic abuse centers for treatment, had been in jail because of his drinking very many *169 times and had been committed to Pineview Hospital in 1971 by his family because of acute alcoholism. He would hallucinate during these bouts of "d.t.'s" and could not remember for long periods of time. Appellant testified that he did not remember anything from the night in question.
Appellant called a number of witnesses who had expertise in the field of alcohol abuse.
Dr. Harry Simpson, a Florence doctor specializing in internal medicine, treated alcoholics at an alcohol abuse center in Florence. He testified that, according to his records, he treated the appellant in December 1975 and May 1976 for "acute and chronic alcoholism." While hospitalized, appellant had "d.t.'s" and hallucinated as well as heard voices. Dr. Simpson also testified that, during "d.t.'s", alcoholics would suffer an "alcoholic psychosis" and lose touch with reality. Alcoholics could also appear to function normally during an alcoholic binge and later not remember their actions.
Mr. W.E. Parramore, clinical supervisor of an alcoholic abuse center, also described the effects of prolonged alcoholism. He further testified that an alcoholic could go on long binges and appear to act normal but would not remember events after he was sober. According to Mr. Parramore, prolonged alcoholism could cause brain damage and affect mental capacity so that one could lose his ability to recognize reality at times. He stated that he never personally observed the appellant.
Dr. Rex Child, a Decatur psychologist who worked at the North Central Alabama Mental Health Center, testified as to the effects of alcoholism on the brain. He stated that alcoholism could be considered a mental disease and that prolonged alcoholism could produce permanent brain injury. When asked a hypothetical question based on appellant's alcoholic condition, Dr. Child testified that this type of person would be the type of individual who would have a major mental disorder. Such a person would have very little emotional control or brain organization. Such a person would also likely suffer a psychotic episode. Dr. Child stated that he had never personally evaluated the appellant.
On rebuttal, the State called Cecil Cooper, the appellant's jailer for the months immediately preceding the trial. Mr. Cooper testified that, after he had observed appellant during this time, the appellant appeared to be sane.
The State also called Dr. Thomas L. Smith, Jr., the Director of the Forensic Unit at Bryce Hospital. Dr. Smith first examined appellant in October of 1980. It was his opinion that appellant did not suffer a mental disease or defect to the extent that appellant could not distinguish the criminality of his acts or be able to control his actions. According to Dr. Smith, appellant suffered from a personality disorder caused by alcoholism, a condition less serious than psychosis.
Appellant asserts that the trial court committed reversible error in overruling his motion for a mistrial based on certain remarks the prosecution made in closing arguments. Appellant contends that the prosecutor's remarks, which included the statement that it was probable the defendant would be released in three months if found not guilty by reason of insanity, constituted ineradicable error. The disputed portion of the District Attorney's closing argument is as follows:
"MR. CAINE: (counsel for appellant) Judge, we are going to object at this point, because I simply said it would be up to the Court, and Mr. Littrell is proceeding to tell the jury what the Court will do, which is not
"MR. LITTRELL: I am not talking aboutI am talking about what Bryce Hospital does. He opened the argument, and I am answering it.
"MR. CAINE: I didn't say anything about Bryce Hospital one way or the other, Your Honor.
"THE COURT: Well, gentlemen, I will explain to you when we get into it. We are talking about two separate things when you are talking about a commitment. One thing what you are concerned *170 with in this case on the plea of insanity, as it has been referred to, is whether or not at the time of the commission of the crime whether Defendant was insane or knew what he was doing as a defense.
"Now, whether or not he is at the present insane is a horse of a different color.
"In other words, he has been found to be sane at this time, because if he hadn't been, he could not have been put to trial. In other words, you have got to understand that we are talking about two different things. The insanity as a defense to the crime was whether or not at the time of the alleged commission of the act that he was insane. Whether or not he is insane now would only have a bearing on whether or not he could stand trial. You can't try him if he is insane now; you would have to wait until he is restored to his right mind, but I will go into that a little bit in detail later.
"Now, Mr. Caine did argue about what would happen, and ordinarily I wouldn't tell you, but as a practical matter if he is found not guilty by reason of insanity, then he would be committed by me or it would be up to me to determine, and he would be committed to some mental institution who would evaluate him and make a determination as to what the status was. And if they found that he was insane, then of course they wouldn't release him.
"So I think in view of that, you can go on with your argument."
Whereupon, Mr. Littrell continued making closing statements to the jury on behalf of the State when the following objection was made:
"MR. CAINE: Judge, you have already explained that, I think.
"MR. LITTRELL: Well, can I finish what I was saying?
"MR. CAINE: We will continue with our objection, then, because Mr. Littrell is now explaining what you have just explained.
"MR. LITTRELL: (To the jury) I was attempting to answer what Mr. Caine was talking to you about having to make an evaluation there, and they have to operate under the rules that are laid down
"MR. CAINE: Judge, we are going to object again. The Court has interjected and explained this, now, Mr. Littrell is explaining your explanation, and we object.
"THE COURT: Well, I think it's suffice to say that once he has committed, if that is the finding, then it would be up to the officials to determine what his status is and what will happen to him, not up to the courts or anyone else.
"MR. LITTRELL: The officials at the insane asylum.
"THE COURT: That's right.
"MR. LITTRELL: And there is no guarantee that he won't be out in three months.
"MR. CAINE: We are going to object to that. There is no guarantee that he won't be down there the rest of his life, Your Honor.
"MR. LITTRELL: The probabilities are that he will be out in three months.
"MR. CAINE: Now, Your Honor, we object to that.
"MR. LITTRELL: I will go on.
"THE COURT: Well, gentlemen
"MR. CAINE: We will ask for a mistrial.
"THE COURT: What happens to him after this trial is not a concern of the jury. You are to determine this case solely on the facts and the law as it applies to whether or not he is guilty of the crime, you are not to concern yourself about what may happen to him after he has finished, any more than you are to concern yourselves with what sentence he would be given, in the event you find him guilty, because your function in this case is to determine, Number One, from the evidence whether or not you are convinced beyond a reasonable doubt and to a moral certainty that he is guilty of some crime. And if he is not, then you have got to acquit him.
"If you find that he is guilty from the evidence, then you must determine whether or not at the time complained of *171 he suffered from a mental disease or defect which would render him, subject to being found not guilty, by reason of the mental disease or defect.
"All right, gentlemen, let's get on with it.
"MR. LITTRELL: Okay.
"MR. CAINE: Judge, we would like to register our objection and ask for a mistrial on the ground that my only argument was to the effect to what would happen to the Defendant on a finding of not guilty by reason of insanity would be that a determination would be made by the Courts. Mr. Littrell has now proceeded to argue over my objection as to what the Department of Mental Health or Bryce or anybody else, what they would probably do and what they always or what they frequently do, or words to that effect, and that is carrying it way beyond, and we think it is very prejudicial, and we would ask for a mistrial.
"THE COURT: Well, I would overrule a mistrial, because you interjected that by your own statement in the case, and he has got a right to answer your argument. However, I think we both have gone far afield, and now go on, gentlemen.
"MR. CAINE: Well, we feel that he went far beyond answering our statement, Judge, and seized on that.
"THE COURT: Well, it gets very difficult once you open up an area, then you cannot easily control it by simply limiting the remarks that the other side may make. It's a privileged area, and it had no part of this lawsuit, but you interjected it, and therefore the State has got a right to answer the same as if they argued certain other things, you would have a right to answer them.
"MR. CAINE: We except, Your Honor."
On many occasions both this court and the Supreme Court have condemned closing remarks by the State that alert a jury to the possibility that a defendant may soon be set free or escape from a state institution if he is found not guilty by reason of insanity. Whisenhant v. State, 370 So.2d 1080, (Ala.Cr.App.1979), cert. denied, 370 So.2d 1106 (1979); Meredith v. State, 370 So.2d 1075 (Ala.Cr.App.1979) cert. denied 370 So.2d 1079 (1979); Christian v. State, 351 So.2d 623 (Ala.1977); Allred v. State, 291 Ala. 34, 277 So.2d 339 (1973); Dunn v. State, 277 Ala. 39, 166 So.2d 878 (1964), Boyle v. State, 229 Ala. 212, 154 So. 575 (1934) White v. State, 376 So.2d 1129 (Ala. Cr.App.1979), cert. denied 376 So.2d 1132 (1979).
However, the State asserts that the statements were not an impermissible reference to an early release from a mental institution, but merely a legitimate reply in kind to a previous argument made by counsel for appellant, and that, in any event, any possible error was adequately cured by the trial court's instructions. The record does not contain the closing argument of counsel for appellant, but we find however, the gist of his closing argument concerned appellant's fate if found not guilty by reason of insanity. In raising objections to the district attorney's argument, counsel for appellant twice made a point that the extent of his closing remarks was that, if appellant was found not guilty by reason of insanity, the court would determine his fate. Neither the trial court nor the district attorney ever disputed this assertion.
We note that wide latitude is given a district attorney in making reply in kind, Richardson v. State, 354 So.2d 1193 (Ala.Cr. App.1978), and the propriety of argument of counsel is largely within the trial court's discretion. McCullough v. State, 357 So.2d 397 (Ala.Cr.App.1978). However, after giving careful consideration to the argument of counsel for appellant, we find no remarks made therein which would justify the argument of the district attorney on the ground that it was in answer to argument made by opposing counsel.
The State contends that, assuming the remarks were prejudicial, any error was cured by adequate instructions of the trial court. In Allred, supra, our Supreme Court held that, because of the cumulative effect of remarks of the prosecutor during the closing argument, the resulting error could not be eradicated by the rulings and instructions of the trial court. Justice Jones, *172 writing for the Supreme Court, held that the case must be reversed, stating:
"It is a general rule that where prejudicial statements are made in the heat of argument, even though improper, in accommodation of our adversary system, such statements are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both. Dunn v. State, supra. See also Arant v. State, 232 Ala. 275, 167 So. 540. But our cases also recognize that an exception to this rule exists where, irrespective of the best efforts of the trial judge to disabuse the mind of the jury of any prejudicial impression, the conviction obtained is not in an impartial atmosphere. Blue v. State, [246 Ala. 73, 19 So.2d 11], supra. See also Pointer v. State, 24 Ala.App. 23, 129 So. 787; DuBose v. State, 148 Ala. 560, 42 So. 862."
Considering the issues, the parties, and the circumstances, the cumulative effects of the quoted portion of the prosecutor's closing argument were so highly prejudicial that their utterance constituted reversible error. Christian v. State, supra. Appellant had a long history of extreme alcohol abuse and it is undisputed that he had been on a prolonged drinking binge when the crime took place. Evidence was presented that defendant had been treated on two occasions for alcoholism at the Four Hundred Unit in Florence. There was also evidence that a direct relation existed between the defendant's consumption of alcohol and his irrational behavior. The prosecutor could have properly commented on these facts and the reasonable and legitimate inferences arising therefrom.
However, the prosecutor exceeded the bounds of legitimate argument when he commented "and there is no guarantee that he won't be out in three months .... the probabilities are that he will be out in three months." These remarks cannot be considered as mere comments on the evidence, and the objections raised thereto should have been promptly sustained and proper instruction to the jury given. Dunn v. State, supra.
The issue for the jury was whether appellant was legally insane at the time of the murder. While this question was one for the jury, appellant presented ample evidence, including expert testimony, from which the jury could have found him legally insane. The state offered the testimony of one expert in rebuttal. The evidence of appellant's mental condition was such that the jury was faced with a delicate and difficult task in resolving the issue. This was evidenced by the fact that, after deliberating three and one-half hours, the jury returned to the courtroom to seek further instructions on the insanity issue.
In reaching this decision, we have relied upon settled and well established principles of law. Although arguments of this type have long been condemned, we have not simply determined that since the rule was violated, the conviction must be reversed. Instead, we have placed the error on the prejudicial effect of the entire argument upon the jury. We note the failure of the trial judge to promptly sustain appellant's objections to such argument and allowance of the irrelevant issue of appellant's fate if found not guilty by reason of insanity to be injected into the jury deliberations. Boyle, supra. Furthermore, there was no significant effort on the part of the trial judge to disabuse the mind of the jury.
The remarks of the district attorney simply had no place in the trial where the question before the jury was whether the defendant was insane at the time he committed the murder. Under § 15-16-24, Code of Alabama 1975, this was their only function.
Because the remarks of the district attorney denied appellant a fair trial and without consideration of further questions raised, this case is reversed and remanded.
REVERSED AND REMANDED.
TYSON and BOWEN, JJ., concur.
DeCARLO, P.J., dissents with an opinion.
*173 DeCARLO, Presiding Judge, dissents.
The appellant interjected into the trial the question of what would happen to him if he were found not guilty by reason of insanity. He should not be allowed to complain on appeal that the State walked through a door which he himself opened.
For the foregoing reason I respectfully dissent.