370 So.2d 1080 (1979)
Thomas Warren WHISENHANT
v.
STATE.
6 Div. 634.
Court of Criminal Appeals of Alabama.
February 20, 1979.
Rehearing Denied March 27, 1979.
*1081 Morris S. Dees, John L. Carroll, Dennis N. Balske, Montgomery, for appellant.
William J. Baxley, Atty. Gen., and James F. Hampton and J. Anthony McLain, Asst. Attys. Gen., for the State.
HARRIS, Presiding Judge.
This is a death penalty case. Appellant was indicted on May 7, 1977, by the Grand Jury of Mobile County for the rape and intentional killing of Cheryl Lynn Payton. The indictment was in three counts, but, at the conclusion of the trial, the trial court struck the third count.
Omitting the formal parts of the two counts upon which appellant was tried read as follows:
"The Grand Jury of said county charge, before the finding of this indictment, Thomas Warren Whisenhant, alias Tommy Whisenhant, whose name is to the Grand Jury otherwise unknown than as stated, did unlawfully and intentionally and with malice aforethought kill Cheryl Lynn Payton by to-wit: on October 16, 1976, during the nighttime the said Thomas Warren Whisenhant, alias Tommy Whisenhant abducted, at gunpoint, the said Cheryl Lynn Payton from the Compact Store located at the intersection of Nan Gray Davis Road and Sweedtown Road in Mobile County, Alabama, where the said Thomas Warren Whisenhant ravished the said Cheryl Lynn Payton and intentionally killed her by shooting in the head with a gun in violation of Act No. 213, Section 2, Sub-section c (Act 213, Section 2(c) Acts of Alabama, Regular Session, 1975, against the peace and dignity of the State of Alabama.
"The Grand Jury of said County further charge, that, before the finding of this indictment, Thomas Warren Whisenhant, alias Tommy Whisenhant, whose name is to the Grand Jury otherwise unknown than as stated, did unlawfully, intentionally and with malice aforethought kill Cheryl Lynn Payton by shooting her with a pistol after the said Thomas Warren Whisenhant, alias Tommy Whisenhant, had ravished the said Cheryl Lynn Payton, against the peace and dignity of the State of Alabama."
On December 13, 1976, appellant was ordered sent to Searcy Hospital for psychiatric examination to determine whether he was competent to stand trial. The following report was returned to the court on February 24, 1977.
"Under the provisions of an Act of the Legislature of Alabama, approved April 17, 1933 (Title 15, Section 425, Code of Alabama recompiled 1958 and as amended by Act 881Acts of Alabama 1965) one Thomas W. Whisenhant, charged with the offense of Murder in the First Degree, was admitted in the Searcy Hospital, Mount Vernon, Alabama, on December 13, 1976, under order of Honorable Joseph M. Hocklander, Circuit Judge, Circuit Court of Mobile County, Alabama, dated December 13, 1976, for psychiatric examination, observation and report as provided in the act referred to herein. Further, the commitment order specifies examination in compliance with Title 15, Section 426 and Title 15, Section 428.
"In accordance with the provisions of the acts referred to above, the Superintendent of the Searcy Hospital appointed Dr. Claude L. Brown, Jr., Consultant Psychiatrist, Dr. James E. Kimbrough, Staff Psychiatrist, and Dr. William H. Rudder, Consultant Psychiatrist, who constitute the undersigned commission. After having the said Thomas W. Whisenhant under *1082 our study and observation continually from the date of admission until the present date, we desire to submit the following report:
"After full study and a long period of observation, it is the opinion of each of us separately, and our opinion jointly and collectively, that the said Thomas W. Whisenhant is presently sane and competent to stand trial; knows the difference between right and wrong; can assist counsel in his defense; and can adhere to the right. The condition of Mr. Whisenhant as observed by each examiner individually throughout his hospitalization has remained unchanged from the time of the first examination to the last examination. His behavior as observed by staff has been basically unchanged from the time of admission and has not been aberrant or psychotic. It is our further opinion that it is possible that he lacked adequate control at the time of the commission of the crimes for which he is charged.
"Under the provisions of the acts referred to above, we understand that with the rendering of this report our obligation and that of the Searcy Hospital has been discharged, and therefore, the Court will cause the proper order to be made for the transfer of the said Thomas W. Whisenhant to its jurisdiction and thus relieve the Searcy Hospital of further responsibility in this case. He will be discharged to the Sheriff of your county or such other person with written authority directed to this institution.
"Awaiting your further order or that of the Sheriff of Mobile County, Alabama.
"Respectfully submitted,
"Signed and executed this the 24 day of February, 1977, at the Searcy Hospital, Mount Vernon, Alabama.
/s/Claude L. Brown, Jr., Md.
Consultant Psychiatrist
/s/James M. Kimbrough, M.D.
Staff Psychiatrist
/s/William H. Rudder, M.D.
Consultant Psychiatrist"
Prior to arraignment, on June 16, 1977, the trial court found appellant indigent and appointed Holmes Whiddon, a licensed attorney in Mobile, to represent him. In the presence of Mr. Whiddon and Mr. Morris Dees of Montgomery, who also represented appellant, appellant waived reading of the indictment and entered pleas of not guilty and not guilty by reason of insanity.
The case was put to trial on August 1, 1977, in Jefferson County Circuit Court, appellant's motion for change of venue having been granted on July 15, 1977. The jury returned a verdict on August 9, 1977, finding appellant guilty of capital murder as charged in the indictment. The trial court adjudged appellant guilty, setting out in a written finding of facts that he found aggravating circumstances to outweigh mitigating circumstances in the case, and sentenced appellant to death during a sentencing hearing on September 7, 1977.
The evidence presented tended to show the following facts:
Robert Lowell testified that he was a resident of Theodore, Alabama, in Mobile County. On October 16, 1976, Mr. Lowell passed by a small Compact Store at the corner of Nan Gray Davis and Sweedtown Roads, approximately a quarter till ten o'clock that night. Mr. Lowell identified two photographs of the victim, Cheryl Lynn Payton, as an employee at the Compact Store. On that evening, it was raining heavily and Mr. Lowell saw Mrs. Payton sweeping water from the store's "walk way."
Defense counsel stipulated the photographs depicted Mrs. Payton and stated that he had no objection to them being offered into evidence. These pictures were introduced into evidence.
Tris Lowe testified that he lived on Two Mile Road in Irvington, Alabama, in Mobile County. On October 16, 1976, Lowe and his fiance stopped at the Compact Store on Sweedtown Road, at approximately 8:30 p. m. There he saw Mrs. Payton, whom he identified in the two photographs previously introduced, and bought two cold drinks. Lowe returned to the store at ten o'clock *1083 that evening. At that time, no one was in the store and no vehicles were in the parking lot. Lowe saw a coke machine open, with the keys in the lock and a broken "six-pack" of Coca-Colas on the floor, with a mop in a bucket nearby. Lowe then identified four photographs depicting the store, to which defense counsel stated that he had no objection to their being admitted in evidence, and they were admitted. When Lowe found the store empty, he attempted to use the pay phone outside; however, the receiver was "tore up." Lowe also noticed a Miller "pony" inside the phone booth. Using the telephone in the store, Lowe summoned police and remained at the scene until sheriff's deputies arrived.
Gary Risher testified that he was a resident of Spring Hill in Mobile in October of 1976. On Sunday, October 17, 1976, Risher and his friend, George Pendarvis, were hunting on the land of Ed Trippe in Irvington, Alabama. Risher then identified three photographs depicting the area and defense counsel stated that he had no objection to their being introduced in evidence, and they were admitted.
Approximately 6:00 p. m., Risher and Pendarvis saw a man standing slightly off the roadside, watching them drive towards him. Pendarvis called the man over to the car and asked him what he was doing there; to which the man replied, he was "walking around." Then, thinking that the man was out "night-hunting," Pendarvis told him, "Well, we know what you are doing here." Pendarvis only repeated that statement when the man asked what he meant by that. The man then walked on in the direction of Highway 90.
On the next Monday evening, Risher identified the man in a lineup at the Sheriff's Department. Of the six men in the lineup, Risher identified appellant as the man whom he and Pendarvis had seen on Ed Trippe's land the evening before. Risher also identified appellant in court as the same man.
George Pendarvis testified that he was a resident of Irvington, Alabama, in Mobile County. Pendarvis's subsequent testimony paralleled that of Gary Risher.
Charles Edwin Trippe, Sr., testified that he lived in Irvington, Alabama, in Mobile County, where he farmed about five thousand acres of land. On a Sunday evening in October, 1976, Risher and Pendarvis notified Trippe that they had seen someone on his property. Trippe drove down to the plot, where the man had been seen, on Monday, October 18, 1976, and parked his car. When Trippe walked out into the field, he discovered the body of a woman clad only in "knee-high" stockings and a blue denim shirt; there were no cuts on the body. Trippe then reached his house in five minutes and called "the law," and met investigating officers at the south end of North Gulf Boulevard ten to fifteen minutes later. When Trippe returned to the field with two officers, the body was gone; however, "drag marks" were leading away from the spot. Trippe and the officers followed the marks, discovering the body in a thicket and covered with boards. At this time Trippe observed cuts on the body; Trippe identified two photographs depicting the victim. A carton of Miller beer in "pony" bottles was near the victim's head.
While waiting for the officers at North Gulf Boulevard, Trippe had seen a white pickup truck on the road. Trippe identified a photograph depicting a white pickup as being the same vehicle he saw that day. Defense counsel having stated that he had no objection to the photograph, the picture was admitted in evidence. Trippe described the driver of the truck as having long, curly-like, reddish brown hair, and a "Fu Manchu" moustache. At the trial appellant was clean shaven and his hair was neatly cut.
Trippe further testified that, after the body was found in the thicket, one officer had gone back to the police vehicle to use the radio. At this time Trippe saw the same truck coming back down the road. The vehicle stopped, turned around, and "took off real fast." One officer remained at the scene with Trippe, while the other undertook pursuit of the speeding vehicle. Trippe identified appellant as the driver of the truck.
*1084 On cross-examination, defense counsel introduced into evidence two color photographs of the victim.
Richard Lee Bryars testified that he was a Deputy Sheriff in the Mobile County Sheriff's Department. On Monday, October 18, 1976, Bryars was organizing a search party of volunteers when Deputy Tillman received a phone call between 10:30 and 10:45 a. m. Bryars and Tillman then proceeded to North Gulf Boulevard in Irvington, Alabama, where they met Charles Trippe. Bryars and his partner then followed Trippe to a field where they subsequently discovered the body. Bryars observed a pool of blood in the spot where Trippe said he had first seen the body. The body was discovered in Mobile County.
Larry Tillman testified that he was a Detective Sergeant with the Mobile County Sheriff's Office. On the morning of October 18, 1976, Tillman was assisting in the organization of a search party to locate Cheryl Lynn Payton, who was missing. After receiving a call from Chief Investigator Driggers, Tillman and Bryars met Ed Trippe at the south end of North Gulf Boulevard. The three men traveled down the dirt road approximately one half mile where Trippe stopped. Subsequently, the body of Cheryl Payton was located.
Tillman then sent a dispatch to the sheriff's office and while still on the radio saw in his rearview mirror the front end of a pickup truck stopped at the top of a hill a quarter of a mile down the road. When the truck turned around, Tillman pursued it, sending out a dispatch relating his actions. The chase continued at speeds from eighty to one hundred miles per hour until the truck crashed through an electrical fence and wrecked in a clump of woods. The driver of the truck jumped out of the vehicle and ran into the woods. Tillman then identified five photographs of the truck, which were introduced in evidence without objection of defense counsel.
After the truck wrecked, the area was surrounded by twenty police vehicles and Chief Investigator Driggers took charge of the situation. An identification check revealed that the truck was registered to appellant. Tillman sent for appellant's wife, and when she arrived she spoke to appellant, through a public address system in a police car, asking appellant to come out. Appellant shouted, "Baby, I have done everything they said I did." Tillman, Driggers, and appellant's wife walked into the woods then, finding appellant standing unarmed among the trees. Appellant told Tillman, "You S.O.B.'s, I am going to make you kill me." At that time, Tillman walked up to appellant and handcuffed him and appellant was led out of the woods and placed in a police car.
On cross-examination, Tillman testified that he, District Attorney Graddick and a Mr. Baker began interrogating appellant at the sheriff's office approximately an hour after he was apprehended. During the interrogation, appellant also admitted he had killed Venora Hyatt, whom he had also abducted from a small convenience store. Defense counsel then introduced in evidence a photograph of that store in which Mrs. Hyatt had worked. Mrs. Hyatt's body was discovered near the side of an old house covered with kudzu vines at the intersection of Halls Mill Road and Higgins Road. Defense counsel then introduced into evidence several photographs depicting the scene and the body of Mrs. Hyatt. That murder occurred almost six months to the day before Mrs. Payton was killed.
Before interrogating appellant he was given the Miranda rights and warnings and he responded that he understood his rights. Then began a question and answer session that covers more than forty pages in the transcript. Some time later there was another interview with appellant prior to which he was again given the Miranda rights and warnings. This was another question and answer session which covered numerous pages of the transcript. Both of these interviews were introduced into evidence by appellant's counsel and read to the jury.
It will serve no useful purpose to set out in full these two confessory statements. It would serve only to overextend this opinion. *1085 The entire episode can best be summed up by quoting from the brief of appellant's counsel:
"On October 16, 1976, the defendant, Thomas Whisenhant, abducted Cheryl Lynn Payton from a Compact Store in Mobile County where she worked as a Clerk. He drove her to a secluded wooded area in rural Mobile County, raped her on the front seat of his pickup truck, and then shot her in the head one time with the 32 pistol he used in the abduction. The murder took place in a field near the truck. He then dragged her body into the wooded area and left the scene.
"On October 17, 1976, he returned to her body, cut off a large section of her breast and slit her abdomen. He was observed near the crime scene and was captured shortly thereafter following a chase.
"Once captured, the defendant freely gave a detailed confession wherein he not only admitted killing and mutilating Mrs. Payton but also killing and mutilating two other women in Mobile County during the previous 18 months. With evidence obtained from the defendant, law enforcement authorities verified the defendant's multiple-mutilation confession. All three, however, involved extensive sadistic mutilation of dead bodies. All three victims were unknown to the defendant.
"At trial, defendant's counsel in opening statement readily admitted that the defendant had committed these three murder-mutilations[1] and also told the jury that the defendant, at age thirteen, had killed an elderly woman. He also told the jury that the defendant had been previously tried and convicted of the brutal beating of a woman while he was in the Air Force."
The officers found a knife lying on the seat of appellant's pickup truck and it was determined to be the knife that appellant used to mutilate the body of Mrs. Payton. Also in the truck were a pair of jeans, panties and a minipad.
Louis P. Driggers testified that he was the Chief Investigator for the Criminal Investigation Division of the Mobile County Sheriff's Department. In November of 1975, Driggers had gone to a Compact Store on Cottage Hill and Schillinger's Road in Mobile, Alabama. There he had found the body of Patricia Hitt, who had been shot in the forehead and killed. On October 18, 1976, Driggers proceeded to the scene of the wreck of appellant's truck. Driggers's testimony concerning the apprehension and arrest of appellant is substantially similar to that of Tillman.
Jim Small testified that he was a State Toxicologist and that he had been employed by the State Department of Toxicology for twelve years. Defense counsel stipulated that Small was an expert in his field, and Small's many qualifications which were still established are not set forth herein.
On October 18, 1976, Small went to the scene of the discovery of Cheryl Lynn Payton's body where he conducted an examination. Clutched in Mrs. Payton's hand was some grass similar to that found near bloodstains sixty feet away. Small accounted for this by reason of "cadaveric spasm," a phenomenon that occurs particularly with head wounds and is commonly seen in cases of suicide by gunshot. The State introduced two photographs depicting that hand of Mrs. Payton clasping grassy material and the hand of Mrs. Wyatt, in which was clutched kudzu vine. Both of these occurrences of "cadaveric spasm" indicated traumatic death.
Upon examination of Cheryl Lynn Payton's body, Small observed a large circular wound over the left breast where the nipple had been removed; a four-inch cut at the base of the left breast; a cut on the right abdomen; a half-inch cut located on the inner margin of the right thigh; a three-eighths inch cut located in the upper pubic region; four cuts inside the external genitalia; two small lacerations on the back of *1086 the skull; and a quarter-inch diameter penetrating wound in the top of the head, which Small determined to be an entrance wound from gunshot. Apparently the two small lacerations at the back of the head were caused by the use of some blunt instrument, occurring "before or immediately surrounding the time of being shot."
Small further testified that he did not find the left nipple at the scene. Additionally, Small took swabs from the victim's vagina, mouth, anus, and stains noted on the leg and chest area. Florence's tests resulted in positive results of seminal stains on swabs taken from the vagina. The spermatazoa were immobile, indicating that they had been deposited for at least ten hours. In Small's opinion, Mrs. Payton had been penetrated. Small also determined the presence of blood in the crotch area of the jeans and panties, and on the sanitary napkin, all of which were found in appellant's truck.
Small further testified that he was present at the Mobile Infirmary where Dr. Bryan Montgomery performed an autopsy upon Mrs. Payton's body. A bullet which was recovered from the brain was determined through ballistics tests to have been fired from a .32 pistol, Smith & Wesson. The bullet, without objection by defense counsel to its admission, was received in evidence. Defense counsel further stipulated that Mrs. Payton's death was caused by the pistol and caused by appellant. The knife found in appellant's truck had no blood or tissue on it. No fingerprints could be raised from the beer carton found near Mrs. Payton's head.
Douglas Payton testified that he lived in Theodore, Alabama, and that his wife was Cheryl Lynn Payton, who was twenty-four years old at the time of her death. On October 20, 1976, Payton last saw his wife alive when he dropped her off at work at the store at approximately ten minutes before 3 o'clock in the afternoon. On that day Mrs. Payton was in her menstrual period and was wearing a sanitary napkin of the type admitted in evidence. Prior to dropping his wife off at the Compact Store on October 16, 1976, Mr. Payton last had intercourse with his wife two days before. Payton then identified a photograph as depicting his wife. The State rested at this point.
Evelyn Stevens, appellant's sister, was called as the first defense witness. Mrs. Stevens testified that appellant had lived in Theodore, Alabama, but had moved to Irvington after he married. There were two older brothers in the Whisenhant family; appellant was the youngest child. Appellant and his family were born and reared in Prichard, Alabama, where their mother still occupied the same house. When their father was alive, he was an electrician and worked at various shipyards in Mobile.
When appellant was born he was very small. His mother kept him in her bedroom, where he slept with her until he was six years old. Appellant continued to sleep in his mother's bedroom, until he was sixteen, in a separate bed. Appellant's father shared a room with his daughter, Evelyn, (now Mrs. Stevens) where they had separate beds. After appellant was born, she would hear her father go into her mother's room at night. Then she would hear her mother "holler, and she would say, `Willie, go back to bed. Leave me alone. I told you to leave me alone.'" All money earned by the Whisenhant family was turned over to the mother. Mr. and Mrs. Whisenhant often fought and when this occurred, Mrs. Whisenhant encouraged appellant and his sister to hit their father. Their mother convinced appellant and his sister that their father kept them from "having anything because he drinks all the time."
Mrs. Stevens further testified that appellant had convulsions one night when he was a baby. The family thought appellant had died, but he later revived. About the time appellant began school, his mother was working at Kress's; after school appellant was kept by his grandmother, whom Mrs. Stevens described as a domineering woman who would stand appellant in a corner and whip him for no reason.
In high school appellant never "dated," except once, when he attended the senior *1087 prom. Appellant's mother kept any money that appellant earned and would not let him out of her sight. After appellant got a driver's license, his mother would go buy gas with him.
Generally, as a child, appellant had a mild disposition, often just sitting and staring. As he grew older, however, appellant could become violent when his requests were not granted. Mrs. Stevens saw appellant grab their mother by the arm several times. Appellant also began to get in trouble, being suspected of killing a woman, ravishing a girl, and purse snatching.
Robert Norman, the minister at the church which the Whisenhants attended, told the family that the appellant was in need of psychiatric help. However, one of the appellant's older brothers angrily claimed that the police were "trying to blame something on an innocent boy."
On October 16, 1976, appellant's little girl was a year old and he called Mrs. Stevens to invite her to a birthday party. At the party appellant appeared to be the "happiest [Mrs. Stevens] had ever seen him in a long time."
James H. Bryant testified that he was a retired captain of the Prichard Police Department. While he was a detective on the force, Bryant knew the Whisenhants, particularly appellant, well. Bryant first encountered appellant over a purse snatching charge. Subsequently, Bryant picked appellant up on a murder charge. An elderly lady, seventy years old, who lived on the same street as did appellant, was shot and killed early one evening. Earlier a pistol had been stolen from a house down the street where appellant had been spending some time with teen-aged friends. Bloodhounds led Bryant to the Whisenhant home; however, appellant's family claimed that he had been home all evening. Bryant came to regard appellant as a "weirdo," and it "passed through [his] mind" that appellant had something against women. Bryant told Mrs. Whisenhant and Evelyn Stevens that appellant needed psychiatric help and "they had better get him straightened up." Appellant's family responded by getting angry and saying appellant was not crazy.
At a much later time, appellant's wife came to Bryant and told him that appellant had told her he wanted to play a game with her to prove he could outsmart police. Then appellant placed a stocking around her neck and choked her till she blacked out, after he had persuaded her to write and sign a suicide note. Bryant told appellant he had "better straighten up."
On cross-examination, Bryant testified that before the elderly woman was killed appellant and his friends had been playing with the pistol which had been stolen prior thereto. Appellant had taken a bullet from the revolver, marked an "X" on it, and said, "This bullet is going to kill somebody."
Claude Brown testified that he was a psychiatrist who had practiced in Mobile County for twenty-six years. Brown graduated from Tulane Medical School in 1945 and spent three years specializing in psychiatry at the Menninger Foundation in Topeka, Kansas. Concurrently, Brown was an associate professor at the University of South Alabama Medical School in the Psychiatry Department. Brown further testified to membership in numerous professional organizations and that he was certified by the American Speciality Board of Psychiatry and Neurology. Brown's articles on psychiatry have appeared in approximately one dozen professional journals. Additionally, Brown listed many other duties and activities he had undertaken in the field of psychiatry which are too numerous to list here.
Brown became involved in appellant's case when appellant was ordered to Searcy Hospital for psychiatric examination and evaluation. Brown and two other psychiatrists, Kimbrough and Rudder, were appointed by Dr. J. E. Condom, the Superintendent of Searcy Hospital, to form a lunacy commission to thoroughly evaluate appellant.
On three occasions, Brown interviewed appellant at Searcy. Additionally, Brown reviewed available records concerning appellant, which included police statements, *1088 photographs relating to the murders, military service records, records of imprisonment, and social service reports of interviews with the Whisenhant family by social workers. These records were supplemented by psychology reports, further social work data, and reports of day-to-day contact with appellant from on-ward aides. In total, Brown spent thirty hours, approximately, evaluating appellant. Four of those hours were spent in actual interviews with appellant. Subsequent to appellant's leaving Searcy Hospital, Brown saw him again for one hour at the Mobile County Jail.
In summary, Brown testified that appellant was aware of the murders that he had committed and that they occurred when appellant was not under the influence of any drugs or in an impaired state of consciousness. However, appellant had no idea why he was doing such things. Appellant consistently expressed anxiety about his family and a desire to see his wife and child.
Appellant was reared in a home that was a "markedly abnormal one." His home was one in which women "ran the show," particularly his mother, who was the dominant figure in the Whisenhant family. Appellant's father was a "non-entity", denigrated, "cast down and cast out, literally as well as figuratively." Brown viewed the father as a non-existent functional male model. Appellant viewed himself as receiving the same treatment as did his father, that is, the subject of contempt, denigration, and being a nonentity.
As appellant grew up, he was by all accounts a shy, relatively reserved person, who had few friends; he had no girl friends. Appellant "remained extensively dominated by Mother," and was "early in trouble."
Brown described the purse-snatching episodes as more than simple robbery, being "aggressive ripping away something valuable of a woman's." Brown considered this an ominous symptom and then recounted appellant's unprovoked assault upon a WAF when appellant was in the Air Force. For this appellant remained in a penitentiary for seven years, where on one occasion he threatened a female teacher in one of the prison's scholastic programs.
At one point, appellant related to Brown that when he was approximately twelve years old he was assaulted by two older girls. These girls threatened to castrate appellant if he did not have intercourse with them. While Brown did not consider this incident to be the definitive source of appellant's problem, he did think that appellant's relation of the story "adds to and conforms to him his picture of the world."
Appellant also told Brown that he had not had sexual relations prior to his marriage and that his sexual relations with his wife were good. However, appellant's wife had become fearful of him following the episode with the suicide note and strangulation.
Shortly before the birth of his first child, appellant purchased a pistol, fearing that his wife might be assaulted while he was away at work. Following the birth of the child, appellant became preoccupied, complaining of "very vague physical pains," and saying that his "head didn't feel like it was there at times." Appellant also had little interest in sexual relations with his wife and their relationship "became more aloof."
Brown considered the timing of the murders of the three women to be in specific reference to appellant's wife's giving birth to the first child. The first murder occurred approximately six weeks after the birth of the child; the second in the same month that his wife told him she was pregnant again; and the third on the night of his first child's first birthday.
Further, Brown emphasized the repetitive patterns of attacks of increasing violence against women since appellant was fourteen years of age. Appellant's development as a child was abnormal, rooted in a miserable relationship with his mother. Brown considered that each murdered woman represented to appellant a direct, unconscious substitute for his mother. The lack of a proper male model in the Whisenhant family prevented appellant from growing *1089 away from the dependence fixation upon his mother. Appellant became a person intensely fearful of the world at large. The purpose of the murders, Brown concluded, was to prevent what appellant perceived to be his own destruction, a fear of which was kindled by his own wife's pregnancy and childbirth.
Brown further explained the purpose for the mutilation of the bodies of the last two victims, saying that the answer lay at several levels. The amputation of the breasts, the cutting of the vagina, and slitting of the stomach amounted to removal of gender identification; that is, appellant made his victims "not female anymore." On another level the mutilations represented an infantile, regressive desire to be a part of the female body again.
As to a diagnosis of appellant's "disease," Brown classified appellant as a "severe schizoid personality with marked paranoid traits, with the traits of necrosadism; that is, the sadistic destructive act with bodies that are dead." In Brown's opinion, appellant was afflicted with a mental disease. Appellant knew right from wrong; however, when he killed Cheryl Lynn Payton, he had so lost the power to select right from wrong, because of duress of that mental disease, that his ability to prevent himself from killing her was destroyed.
On cross-examination, Brown testified that he knew of no treatment program with any reasonable expectation of helping appellant. If appellant had not been apprehended after Mrs. Payton was killed, Brown testified, it was probable that he would have become more violent and committed more murders in a shorter period of time.
Dr. Brown's testimony concluded the case for the defense, and the defense rested. The State then proceeded to produce evidence in rebuttal.
Danny Wren testified that he was employed as a shipfitter at Ingall's Shipbuilding in Pascagoula, Mississippi. Appellant worked in Wren's crew at the yard over a two-year period. When appellant was arrested, Wren believed appellant incapable of such acts, appellant having appeared normal to him. In Wren's opinion, appellant was not insane.
Wren's testimony was followed by that of four other of appellant's co-workers. Each had never observed appellant act abnormally and thought he was sane.
Mary Fern Reymundo testified that she and her husband lived in Irvington, Alabama, where they knew appellant and his wife and had visited in their home. Mrs. Reymundo considered the Whisenhants to be a very happy couple and never knew appellant to act abnormally. James Reymundo, who also testified, shared his wife's opinion.
Kathleen Brannan testified that she and her husband were appellant's and his wife's closest friends, often visiting each other on social occasions. Mrs. Brannon thought that the Whisenhants's marriage was a good one, though appellant and his wife argued a little. Appellant never appeared to be insane, deranged, or high tempered to Mrs. Brannan. On October 16, 1976, Mr. and Mrs. Brannan attended appellant's daughter's birthday party where appellant appeared to be as he usually was.
Jack Brannan, Kathleen's husband, who also testified, shared his wife's opinion of appellant. Brannan further identified a .32 caliber pistol as a weapon that he had sold to appellant before his first child was born. Brannan also identified the knife in evidence as being of the kind that appellant carried.
Preston Arthur testified that he had been a United States Probation and Parole Officer for two years, assigned to the Mobile Division. Appellant's was one of the cases Arthur was assigned to supervise, and appellant reported to Arthur monthly. In Arthur's opinion, appellant was no different from any other twenty-nine year old criminal.
Henry Frank Skinner testified that he worked as a general practitioner of medicine at Searcy Hospital. Skinner ran a physical examination of appellant on the day after his admission to Searcy and found *1090 no physical problems. In his opinion appellant was sane.
Elvin Harper testified that he worked as an aide at Searcy Hospital and that he had had opportunities on a daily basis to observe appellant and carry on conversations with him. Harper considered appellant to be a sane man.
W. D. Little testified that he was a security officer at Searcy Hospital where he had observed appellant on a daily basis. Appellant appeared sane to Little.
James Edward Kimbrough testified that he was a psychiatrist and Assistant Superintendent at Searcy Hospital. Kimbrough finished medical school at the University of Alabama in 1952 and interned at the University Hospital in Birmingham, Alabama. Afterwards, Kimbrough engaged in general practice for seventeen years until he was trained in psychiatry at University Hospital, beginning in 1971. Kimbrough then taught at the University of Alabama in Tuscaloosa in the College of Community Health Sciences to residents in Family Practice.
Kimbrough saw appellant for approximately five hours on four or five separate occasions. Additionally, Kimbrough reviewed appellant's case history ten to twelve hours. Kimbrough, agreeing with Rudder and Brown, diagnosed appellant as a schizoid personality with paranoid, necrosadistic features and episodic discontrol.
In discussing the appellant's development, Kimbrough would not forward any thesis as to the nature of the purse-snatching incidents, saying that he did not have sufficient information to make such a judgment. Kimbrough did testify that a chaotic childhood, coupled with fear and some helplessness on the part of the purse-snatching victim, would make appellant aware of needs which had gone unmet, that is, need of an outlet of hostilities and seeing someone controlled. Appellant did not remember these episodes when interviewed by Kimbrough.
Kimbrough would not comment on Brown's psychiatric theory of appellant's case. However, Kimbrough agreed that in a person of abnormal personality development the circumstances of appellant's wife's pregnancy would be the addition of another stressful situation, from a standpoint of physical and financial needs.
Kimbrough further testified that appellant did not have a diseased brain. Nor was appellant a schizophrenic, though he exhibited characteristics of a schizoid personality.
Further, Kimbrough did not know whether appellant knew right from wrong at the time he murdered Cheryl Lynn Payton. However, in Kimbrough's opinion, appellant possessed the type of external control which would cause appellant to run away from a situation in which he could be "caught."
Additional opinions of Kimbrough concerning appellant's responsibility for his acts are set out below:
"Q. Okay. We'll go over this, Doctor. `If he did have such knowledge,'That's referring to whether he knew right right from wrong
"THE COURT: Did you show him the question?
"MR. HALE: Yes, sir.
"THE COURT: Go ahead.
"Q. `He, nevertheless, by reason of the duress of such mental disease, had so far lost the power to select the right and to avoid doing the act in question as that his free agency was at the time destroyed.' Do you understand the question?
"A. Now, you're talking about at the time of the murder?
"Q. Right.
"A. That's the question I don't know the answer to because this mutilization in a necrosadism, all of this cutting and amputating parts and evisceration, is a very pathologic thing to me. Now
"Q. To you?
"A. Yes. And killing may be necessary to do this because, I think, the fantasies most of the time in necrosadism that somehow this person can still feel the shame, the humiliation, the pain and all of this. And I think this is unreal.
"Q. Well
*1091 "A. But now
"Q. What aboutI'm not talking about the time
"MR. DEES: Let him finish.
"MR. HALE: Oh, okay, I'm sorry.
"THE WITNESS: Now, whether or not he could make a rational decision to kill this person to accomplish this pathological mutilation, I don't know."
On cross-examination, Kimbrough testified that appellant's "anger" was focused on women, though possibly not limited to them. Appellant's "control" of his acts extended to picking time, place, victim, and method of killing. Appellant would "kill again if . . . set free," Kimbrough concluded.
Kimbrough on recross and redirect examination explained that appellant's schizoid personality, etc., was a mental disorder, not a disease. Upon seeing appellant in a last interview, Kimbrough opined that appellant was sane and appreciated the consequences of his acts.
Noble Wayne Harrison testified that he was a staff psychologist at Searcy Hospital. Harrison's training included a Bachelor's Degree in Psychology from Southern Illinois University; a Masters Degree in Clinical Psychology from Xavier University; a Doctorate in Counseling Psychology from the University of Mississippi; attendance at various seminars; membership in the American Psychological Association; and membership in the Association for Advancement of Behavior Therapy.
Harrison testified that he interviewed appellant at Searcy Hospital approximately twenty to twenty-two hours over a four-month period, describing him as a man of average intelligence with shrewd and cunning attributes. In his opinion, Harrison testified, appellant exercised "adequate control" at the time he killed Mrs. Payton, was rational, and appreciated the consequences of his acts. Appellant knew that he was doing wrong.
William H. Rudder testified that he was a psychiatrist in private practice in Mobile. Rudder graduated from the University of Alabama Medical School in Birmingham and then went into general practice, after interning at City Hospital in Mobile. Subsequently Rudder completed a three-year residency in psychiatry at the medical school in Birmingham. Rudder performed duties as a consultant in psychiatry in all hospitals in the Mobile area, including Searcy.
Rudder was one of the three psychiatrists appointed to the "lunacy commission" to evaluate appellant. In total, Rudder reviewed appellant's case seventy-five to a hundred hours, approximately ten of which were spent in personal interviews. At these times Rudder regarded appellant as "completely coherent."
Rudder further testified that appellant was not atypical, having observed many other persons with similar backgrounds. When appellant killed Mrs. Payton, Rudder testified, he knew the difference between right and wrong and appreciated the consequences of his acts. In short, Rudder formed the opinion that appellant was sane at that time. However, when asked whether or not the mutilations of the victims' bodies were psychotic acts, Rudder replied:
"A. In this part of the world, here and now, most anybody would say that it looks, acts and is crazy, is insane. It's just that simple."
Whether or not there was a connection between appellant's killing the victims and mutilating them, Rudder testified that only appellant might know.
On cross-examination, Rudder testified about a pretrial interview, held with defense counsel. From the record:
"Q. You can. Doctor, I just have one final question. If your opinion has changed today, well, maybe it's changed. In my interview with you I asked you the question, `You don't know, you have no opinion either way, that he was or was not medically insane at the time he committed the crime?' And what was your answer?
"A. Okay.
"Q. Just what was your answer then?
"A. Okay. Could I tell you something?
*1092 "Q. Well, could you read your answer first, and then tell me anything you want to. I asked you the question whether you had no opinion whether he was medically insane. What was your answer? Just read it to the jury.
"A. What you have written down there underscored in red says, `I don't know. I do not know.'
"Q. Read the rest of it.
"A. I said, `I don't think anybody knows. I think you can get as many theories as you can round up psychiatrists, but' And then you cut me off.
"Q. All right. I said now, `So, if you're on the stand you can't testify for him or against him. In effect, you can't say that he didn't know what he was doing.' And what was your answer?
"A. Let me see now. Where are you now?
"Q. The very last page.
"A. Well
"Q. Doctor, wasn't your answer, `In effect, you can't say he knew what he was doing, and you can't say that he did not know what he was doing.' And your answer was, `No, I don't know.'
"A. You asked me what my answer was. Now, I'll tell you the same thing it probably says on that. No, I don't know, until I look at it and see. That's the last page?
"Q. Yes, sir. There are the last few lines. `So, if you're on the stand, you can't testify for him or against him. In effect, you can't say he knew what he was doing, and you can't say that he did not know what he was doing.'
"A. Yes. Now, what was your
"Q. Question?
"A. Un-huh. (Indicating yes.)
"Q. `So, if you're on the stand, you can't testify for him or against him. In effect, you can't say that he knew what he was doing, and you can't say that he didn't know what he was doing.' Just read your answer.
"Q. All right. You said thatYou asked me if IYou said, `You cannot say that he did not know what he was doing.' That's a double negative. What does that mean?
"Q. Sir, just read what your answer was.
"A. Well, you asked me, you said, `You can't or you cannot say that he didn't or did not know what he was doing.' You have a double negative. What does that mean?
"Q. Do you think there was some doubt about what we were talking about?
"A. I think he was
"Q. Well, let's just read your answer and go right on to the next question then. What was your answer?
"A. Well
"Q. Just read your answer, sir.
"A. On mine or yours?
"Q. They should be the same. That's it right there, Doctor. (Indicating.) Just read that.
"A. I said, `No, I don't know.'"
Rudder further testified on direct that appellant's diagnosis was a personality disorder. Additionally, Rudder had no doubt that appellant would kill again "if he gets out." Rudder then concluded that appellant was sane when he killed Mrs. Payton.
Virupaksha Kothandapani testified that he was a native of India; however, he had lived in the United States for the last ten years. Kothandapani was an assistant at Franklin College, Indiana until 1975. Kothandapani's numerous other qualifications, publications and honors are omitted.
While appellant was at Searcy, Kothandapani performed eleven evaluative tests upon him and conducted approximately twenty hours of interviews with him. The tests showed appellant to be of normal intelligence with good abstractive ability. However, appellant also was having a certain amount of emotional instability, feeling that he was a "victim," and very defensive.
Kothandapani explained that appellant's diagnosis would be classified as a personality disorder. In summary, Kothandapani testified that it was highly probable that appellant knew right from wrong at the *1093 time he killed Mrs. Payton and it was highly probable that he was sane.
Kothandapani's testimony concluded the evidence in the case.
Appellant first contends that the Alabama capital sentencing procedures are violative of the Eighth and Fourteenth Amendments to the Constitution of the United States because they fail to provide a reliable process for determining that death is the appropriate punishment in a particular case. Discussion of this question is pretermitted since our Supreme Court has affirmed the constitutionality of Acts of Alabama 1975, No. 213, §§ 1 et seq. [now Code of Alabama 1975, §§ 13-11-1 et seq.] in Jacobs v. State (Ex parte Jacobs), Ala., 361 So.2d 640, released May 19, 1978.
Also appellant argues that Alabama's capital sentencing procedures are faulty in that the trial judge is limited to consideration of mitigating circumstances enumerated by the statute, thus violating the Eighth and Fourteenth Amendments to the Constitution of the United States. Again, no discussion of this question is warranted. Our Supreme Court held in denying Jacobs's motion for rehearing that §§ 13-11-1 et seq., supra, comport with the decision of the United States Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973.
Next, appellant contends that the trial court erred in failing to find the presence of any mitigating circumstances following evidence presented in the post-verdict sentencing hearing. A summary of that evidence and the trial court's written findings of fact to support the imposition of the death penalty are set out below.

State's Evidence
William H. Rudder testified that he was a psychiatrist in private practice in Mobile and that he had testified in the trial of this case during the week of August 10, 1977. Rudder summarized his testimony given at trial and further testified appellant was not under duress of extreme emotional disturbance at the time he raped and killed Mrs. Payton.
Virupaksha Kothandapani also summarized his testimony at trial. Kothandapani agreed with Rudder that appellant was not influenced by extreme mental or emotional disturbance at the time he committed the offense.
James H. Bryant, the retired Captain of Police from Prichard, Alabama, who testified at trial about appellant's early criminal history, recounted an incident committed by appellant when he was under sixteen years of age. Appellant had held three young girls at gunpoint, forced them to undress and had taken money from them. To his knowledge, Bryant testified, appellant had knowingly created a great risk of death to many persons.
Through Preston Leon Arthur, appellant's federal parole officer, records of appellant's general court martial for assault with intent to murder and disposition were admitted in evidence.

Defense's Evidence
Appellant introduced into evidence a report from Dr. Emanuel Tanay concerning appellant's mental condition. In summary, the report diagnosed appellant as a chronic schizophrenic and declared that, "there can be little doubt that Mr. Whisenhant `lost the power to select the right and to avoid doing the act' . . ." which was solely the product of the diagnosed mental illness.
Hans Zeisel testified that he was a Professor Emeritus of Law and Sociology at the University of Chicago. A list of Zeisel's publications was introduced into evidence. Zeisel had familiarized himself with appellant's case and stated that in his opinion the death penalty was not justifiable in that the perpetrator of a crime of this nature is most unlikely to be deterred by knowledge or fear of the penalty.
Appellant's wife and sister then appealed to the trial court to have mercy on appellant.

The Trial Court's Findings
Following the taking of testimony and argument by counsel, the trial court sentenced *1094 appellant to death and returned the following written findings of fact to support the imposition of sentence.
"The Court, having conducted a Hearing pursuant to Title 15, Section 342(5) of the Code of Alabama, to determine whether or not the Court will sentence Mr. Thomas Warren Whisenhant to death or to life imprisonment without parole, and the Court having considered the evidence presented at the trial and at said sentencing hearing; the Court makes the following findings of fact:
"The court first considers the aggravating circumstances as described in Title 15, Section 342(8):
"(a) The Court finds that the Capital Felony was committed by Thomas Warren Whisenhant while he was under sentence of imprisonment, although he was serving the latter part of his sentence on parole at the time.
"(b) The Court finds no evidence that Mr. Whisenhant was previously convicted of another Capital Felony. However, the Court finds that the aforementioned sentence of imprisonment was a felony involving the use of violence to the person. And, in addition thereto, the Court finds convincing evidence that Mr. Whisenhant murdered three other women, other than Cheryl Lynn Payton.
"(c) The Court finds that other than that set out above in subparagraph (b) there is no creditable evidence that the defendant did knowingly create a risk of death to other persons. However, the evidence is overwhelming that the only reason being that he was apprehended. And, the Court finds from the uncontradicted evidence that if the defendant were returned to a free society that he would kill again.
"(d) The Court finds that the Capital Felony was committed shortly after the defendant raped the deceased, Cheryl Lynn Payton.
"(e) The Court finds that the Capital Felony was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
"(f) The Court finds that the Capital Felony was not committed for pecuniary gain, within the meaning of Section 342(8)(f).
"(g) The Court finds the Capital Felony was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
"(h) The Court finds the Capital Felony of Cheryl Lynn Payton was especially heinous, atrocious or cruel. The defendant with precise intent and design abducted the deceased from her employment at the compact store, and then drove her to a secluded area in Mobile County, Alabama, and while raining outside of his vehicle, forced her to disrobe and raped her. The defendant then by force lead the deceased to a wet wooded area adjacent to his parked vehicle and shot her through the head while she was begging for her life. The medical testimony revealed the deceased's death as being extremely painful and cruel. As the Court has stated, it is the personal opinion of this Court that the Capital Felony was especially heinous or atrocious, but the Court has little precedent or authority which would allow it to hold as a matter of law, that this Capital Felony meets the test of being especially heinous or atrocious or cruel as set out in Section 342(8)(h). However, in the case of State v. Dixon, 283 So.2d 1, the Supreme Court of Florida speaking to this point of especially heinous, atrocious or cruel said:
"`. . . Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others . . .'
"If this be the legal test on this point, then this Court is lead to no other conclusion from the evidence than the Capital *1095 Felony was especially heinous, atrocious or cruel, and the Court so finds.
"The Court now considers mitigating circumstances as described and set out in Section 342(9):
"(a) The Court finds that Mr. Whisenhant has a significant history of prior criminal activity.
"(b) The Court finds that the Capital Felony itself was not committed while Mr. Whisenhant was under the influence of extreme mental or emotional disturbance.
"(c) The Court finds that the victim was not a participant in Mr. Whisenhant's conduct, and did not consent to the act.
"(d) The Court finds that Mr. Whisenhant was not an accomplice in the Capital Felony committed, but was, in fact, the principal who fired the shot causing the death of Cheryl Lynn Payton, deceased.
"(e) The Court finds that Mr. Whisenhant did not act under extreme duress or under the substantial domination of another person.
"(f) The Court finds that the capacity of Mr. Whisenhant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired.
"The Court having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances, it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty as fixed by the Jury should be and is hereby accepted.
"It is therefore considered and adjudged by the Court that Thomas Warren Whisenhant, is guilty of the Capital Felony charged in the indictment, and specifically of raping and intentionally killing of Cheryl Lynn Payton, deceased. It is therefore ordered and adjudged that you, Thomas Warren Whisenhant, suffer death by electrocution at any time before the hour of sunrise on the 7th day of December, 1977, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
"It is therefore further ordered and adjudged by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in case of his death, disability, or absence his Deputy, or in the event of the death, disability, or absence of both the Warden and his Deputy, the person appointed by the Commissioner of Corrections, at any time before the hour of sunrise shall on the 7th day of December, 1977, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Thomas Warren Whisenhant, a current of electricity of sufficient intensity to cause his death, and the continuance application of such current through the body of the said Thomas Warren Whisenhant, until the said Thomas Warren Whisenhant, be dead, and may Almighty God have mercy on Your Soul.
"Ordered this the 7th day of September, 1977.
 /s/Ferrill D. McRae, Circuit Judge
 Thirteenth Judicial Circuit
 State of Alabama"
Appellant's argument centers on the trial court's failure to find that the offense was "committed while the defendant was under the influence of extreme mental or emotional disturbance." Section 13-11-7(2), Code of Alabama, 1975. Appellant insists that such indeed was the case and that the trial judge was manifestly wrong in not finding this factor to exist.
Appellant points out that the mitigating circumstances in issue may be based on evidence of a lesser standard than is necessary to find insanity. In State v. Dixon, Fla., 283 So.2d 1, we find the following language:
"Extreme mental or emotional disturbance is a second mitigating consideration, pursuant to Fla.Stat. § 921.141(7)(b), F.S.A., which is easily interpreted as less *1096 than insanity but more than the emotions of an average man, however, inflamed."
* * * * * *
"Mental disturbance which interferes with but does not obviate the defendant's knowledge of right and wrong may also be considered as a mitigating circumstance. Fla.Stat. § 921.141(7)(f), F.S.A. Like subsection (b), this circumstance is provided to protect that person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state."
However, after a review of the evidence presented at the hearing, it cannot be said that the trial court was wrong in its findings. The evidence presented by the State was ample to negate the presence of this mitigating circumstance.
Prior to trial, appellant moved that the Court allow no death qualification questions be asked of the venire, since such questioning would bias the jury in favor of conviction. Appellant presented the testimony of Dr. George Jurow, whose study, New Data on the Effect of a Death Qualified Jury on the Guilt Determination Process, 48 Harvard L.R. 567, concludes that a death qualified jury is more prone to convict than a non-death qualified jury. Appellant contends that such jury qualification thus denies his right to an impartial trial under the Sixth and Fourteenth Amendments to the Constitution of the United States.
This Court has continued to follow the tenet of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. See Jacobs v. State, Ala.Cr.App., 361 So.2d 607, 625, cert. denied, Ala., 361 So.2d 640. The trial court was correct in denying appellant's motion.
Prior to trial appellant moved that he be provided funds in order to employ experts to aid in the preparation of his defense. In particular appellant desired to employ a forensic psychiatrist, Dr. Emanuel Tanay, mentioned above. At one point, the trial court ordered that appellant be given three hundred dollars toward this purpose. However, the order was subsequently denied. Appellant now insists that, because he was unable to employ the experts he desired, "the State was able to . . . overwhelm [his] insanity defense." Appellant asserts that this action violated his right to due process as guaranteed by the Fourteenth Amendment to the Constitution of the United States.
Such assertions have been addressed by this Court before. In Johnson v. State, Ala.Cr.App., 335 So.2d 663, cert. denied, Ala., 335 So.2d 678, we find the following language:
"Appellant claims the denial of funds to pay defense expenses for investigators and assistance of experts amounts to a denial of equal protection of the law.
"In Tillis v. State, 292 Ala. 521, at p. 525, 296 So.2d 892, at p. 895, our Supreme Court stated:
"`The defendant makes the argument that because of his indigency, he was not able to adequately investigate or procure witnesses in his defense, and the State does not award sufficient funds to pay an attorney and do those things, too. To be sure an indigent defendant is in a difficult position. This question has been raised before. Wheeler v. State, 47 Ala. App. 457, 256 So.2d 197 (1971). While some provisions are made for this in the federal system, it is not the present situation in this State. . . .'
"Title 18, § 3006A(e), U.S.C.A., provides financial assistance to indigent defendants to obtain investigative, expert or other services necessary for adequate defense. Other states, such as California provide for such assistance, however, the Alabama legislature has not enacted such a statute in this state. As stated in Harris v. State, supra, `Appellant was not denied due process where the state did not provide funds for the employment of a special investigator to aid him in procuring witnesses in his defense. . .'"
As previously noted the venue of this case was changed from Mobile to Jefferson County, where it was tried in Birmingham. *1097 The striking of juries in Jefferson is governed by Acts of Alabama 1955, 2nd Ex. Sess., p. 166, which provides for a one-for-one striking of jurors in counties with populations of more than 400,000. This provision has been held constitutional because it is reasonably related to conditions which exist in Jefferson County. Liptroth v. State, Ala.Cr.App., 335 So.2d 683, cert. denied Ala., 335 So.2d 688.
Prior to trial defense counsel filed the following motion:
"DEFENDANT'S MOTION TO RETAIN HIS TWO FOR ONE JURY STRIKING PRIVILEGE
"Comes the defendant and moves the Court to allow the defendant two jury strikes for each one strike allowed the prosecution as provided for by law for every county except Jefferson. The defendant sets forth the following grounds in support of his motion:
"1. The defendant sought a change of venue from Mobile County because of the pre-trial publicity generated by the District Attorney and Sheriff of Mobile. Without the generation of this publicity, the defendant's fair trial rights would not have been jeopardized and he would not have sought a change of venue.
"2. In the original venue, Mobile County, the defendant is entitled to have two jury strikes for every one by the state.
"3. In Jefferson County, a defendant is permitted only one strike per state strike.
"4. Had the trial been moved to any other county, the defendant would have retained the two to one strike ratio.
"5. If the defendant is not permitted to retain this two for one strike ratio, then this Court is permitting the District Attorney to benefit from the misconduct which resulted in the granting of the change of venue.
"6. Since this case is being transferred from Mobile County, since the indictment was returned in Mobile County and since the Judge and the District Attorney are from Mobile County, the two for one strike law in effect in Mobile County should apply to this case.
"7. If the two for one strike law is not applied in this case then the trial judge's decision to move this case to Jefferson County will be so arbitrary as to violate the defendant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.
"8. Further the statutory provision applying only to Jefferson County which restricts the number of defense strikes to one for every prosecution strike, violates the defendant's right to due process and equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution in that other capital offenders tried in Alabama's sixty-six remaining counties receive two strikes for each one by the prosecution."
Following a hearing on the motion, the trial court ruled that the one-for-one strike law would be utilized for selecting the jury.
Appellant now contends that applying this law to his case was a denial of equal protection of the law. He notes that all substantial contacts of the case lie in Mobile County; thus application of the strikes law results in an arbitrary distinction. Appellant does admit the constitutionality of the act as applied in Jefferson County.
We believe that the one-for-one strike law was appropriately applied in the case at bar. The Alabama law on change of venue would seem to take into consideration the situation which has arisen here. When an order for removal on a motion for change of venue is made, the jurisdiction of the transferring county ceases and the jurisdiction of the court to which the case is moved commences. Ex parte Lancaster, 206 Ala. 60, 89 So. 721.
Although appellant's case was completely a "Mobile" case in origin and nature, it was tried in Jefferson County, where special circumstances of greater population and higher crime rates comprise the rationale for the statute in question. Dixon v. State, 27 Ala.App. 64, 167 So. 340, cert. denied, 232 Ala. 150, 167 So. 349. The legislative policy which led to the one-for-one *1098 strike law applied in Jefferson County remains as cogent and compelling whether applied to a Jefferson County resident tried in that county or a Mobile County resident whose case is transferred to that jurisdiction. Thus it cannot be said that the statute in question was arbitrarily or capriciously applied to appellant; and no error resulted from its application.
The sole question to be determined by the jury from the evidence in this case was whether or not appellant was sane at the time of the offense. Defense counsel, as noted in the facts, stipulated that appellant did kill Mrs. Payton. Appellant contends that the prosecutor made certain remarks during closing argument, informing the jury of the consequences of returning a verdict of not guilty by reason of insanity, which resulted in reversible error.
To set the problem in proper perspective, it is necessary to document certain occurrences before and during trial in addition to the remarks alleged to have been improper.
Prior to trial defense counsel filed the following "Motion in Limine."
"MOTION IN LIMINE
"Comes the defendant and moves this Court for an order prohibiting the prosecutor during the course of the jury voir dire and trial from making any reference, directly or indirectly, to any of the following matters, separately or severally:
"(a) References to the fact that the defendant, if found legally insane by the jury, could be released at some subsequent point in time.
"(b) References to the fact that the defendant, if given a sentence less than death, could be released at some subsequent point in time.
"(c) References to the fact that if the defendant is found not guilty by reason of insanity at the time the offense was committed but is found presently sane, that the defendant would not be incarcerated but would be legally free.
"(d) References to the fact that the defendant was incarcerated previously and after his release he committed further crimes and that the jury should vote guilty and impose the death sentence to insure that the defendant will not be released upon the public.
"The defendant lists the following grounds in support of his motion:
"1. The defendant is charged with a serious offense that could result in the death penalty.
"2. Evidence or comments of the matters set out above have no probative value of guilt and would be inadmissible if offered into evidence.
"3. Because of the potentially damaging nature of said remarks, it would be of little use to object to them during trial or to have the Court attempt to erase them from the jury's mind with a cautionary instruction.
"4. The Court has denied the right of individual sequestered jury voir dire and any such remarks made to one or more jurors would be heard by all jurors in the courtroom. Once made, it would be near impossible for any juror to forget the remarks or erase them from his or her memory upon cautionary instruction from the Court.
"5. An in limine ruling is required in order to insure that the defendant's constitutional rights are not violated.
"The defendant requests a hearing on this motion."
When this motion was heard by the trial court, the following occurred:
"THE COURT: If you want me to tell the district attorney at this time that he cannot comment on what would happen to the Defendant in the event that the jury should return a verdict of not guilty by reason of insanity, I will do that.
"MR. CARROLL: We would like that, Your Honor."
* * * * * *
"THE COURT: . . . What he is saying is, Number one, he doesn't want any comments about the fact that our mental hospitals in Alabama, i. e., Searcy and Bryce Hospital are very lenient about letting people out.
"MR. GRADDICK: I agree with that."
*1099 During the trial, while the prosecutor was examining Dr. Skinner, a general physician at Searcy, the following colloquy occurred:
"Q. Searcy Hospital is a State hospital where they lock up insane people.
"A. Right.
"Q. Or they send people to Searcy if they're insane to treat them?
"A. Right.
"Q. If they're not insane, or if they're sane, do they keep them there?
"A. They're not kept. They're evaluated and returned to the proper places.
"Q. I see. So, if they're sane, they won't keep them at Searcy Hospital?
"A. That's right.
"Q. The people that they have up there are considered to be insane; is that correct?
"A. Every patient is insane.
"Q. Men and women?
"A. Right.
"Q. And over the twelve-month period of time you've had an opportunity to look at all these men and women that have been diagnosed as having been insane and having to be kept at the hospital?
"A. Right.
"Q. Those who are sane aren't there?
"A. That's right.
"Q. You probably could compare those individuals who are suppose to be insane to Tommy Whisenhant, can't you?
"A. I don't think I understand you.
"Q. Well, can you make a comparison about all the people you've seen that are judged to be insane by doctors and have an opinion as to whether or not he's insane?
"A. I would think so.
"Q. What is your opinion?
"A. I think he's sane.
"MR. GRADDICK: No other questions."
Immediately after this witness testified, defense counsel called the line of questioning to the trial court's attention and stated that he would consider reference to this testimony in closing argument as improper.
Subsequently, defense counsel moved for a mistrial and put on evidence. Defense counsel took the stand and testified that he observed the prosecutor give a television interview. From the record:
"Q. Can you tell the Court what the substance of that interview was?
"A. Several things were asked. He was asked the question to the effect of why did he ask Dr. Skinner what he asked him, what point he was trying to make, or something to that effect, and so Mr. Graddick said something to the
"MR. HALE: Judge, we object to this on the grounds it's not the best evidence. The film itself would be.
"THE COURT: I overrule. Go ahead.
"THE WITNESS: Mr. Graddick said something to the effect that I wanted them to know, referring to the jury, what happens to a person who is sent to that hospital and is found sane, that they'll get out later on the public, something to that effect. Mr. Graddick said it on television."
The defense then called the prosecutor to testify and the following occurred:
"DIRECT EXAMINATION
"BY MR. CARROLL:
"Q. Mr. Graddick, did you this afternoon give an interview to Mr. Mike Sullivan on Channel 5?
"A. Yes, sir.
"Q. When Mr. Sullivan asked you the question, why did you ask of Dr. Skinner the consequences of someone being sent to Searcy who is found sane, what did you respond to Mr. Sullivan?
"A. Mr. Carroll, honest to God I can't remember because I gave three interviews out there. I've given interviews every day this week and I'm justI'm not in a position to tell you exactly what I told him. As a matter of fact, I would have to go look at the film and make the determination.
"Q. So, it's your testimony you simply don't know what you told the press?
"A. Well, I mean I know in essence what I told him, but I can't remember word-for-word.
"Q. What did you say in essence then?
*1100 "A. I think I toldMr. Sullivan said that he had talked to Mr. Dees regarding why he made thewhy he didn't object when I asked the question and what my response to Mr. Dees' waiting until the jury was gone and making a motion for a mistrial. And I told Mr. Sullivan that I asked the question of Dr. Skinner so that I could, and I think I used the word `inform' them, and it was the jury, that Searcy Hospital does not keep sane people in there, in essence."
The trial court denied the motion for mistrial. Further, he denied a motion to instruct the prosecutor to refrain from making further such remarks and a motion to instruct the jury to disregard Dr. Skinner's testimony quoted above.
Then in closing argument to the jury, the prosecutor stated as follows:
". . . We send insane people to institutions. Did you hear that? We send insane people to institutions. Insane people to institutions. This man is sane. We are not sending any insane person to an institution. He is sane. And he says the Judge has the authoritywhich he does by lawto determine what to do with the Defendant if you happen to find him not guilty by reason of insanity, but I can't see how you can. I will argue to you that the law is that they've got to discharge someone at Searcy Hospital
"MR. DEES: Object, Your Honor. May we approach the bench, Your Honor?
"MR. GRADDICK: (resumed): If he is found sane
"THE COURT: Just a minute.
"MR. DEES: May we approach the bench, Your Honor?
"THE COURT: Go ahead.
(Discussion held at bench off the record.)
"MR. GRADDICK (resumed): Now, what I'm telling you is that there is not a State institution that is going to take a sane man if he is sane. So what we are saying is this: We are saying that we have proven that this man is guilty beyond all doubt. We are saying that the Defendant had to come off with this defense of insanity. He was sent to Searcy Hospital and evaluated by two psychologists and three psychiatrists. One out of five said that he thought the man was insane at the very moment that he killed Cheryl Payton. The other four said that he was sane.
"They are not going to take a sane man if you say that he is innocent. If you say that he is not guilty by reason of insanity, the Judge then has to do his duty."
At the end of closing argument defense counsel moved for a mistrial on the basis of these comments in argument, which the trial court denied. The trial court further refused to give the jury precautionary instructions.
It has been long established law that such argument is highly improper; however the resulting error could be cured by the trial court's sustaining objection to the comment and instructing the jury to disregard it. Anderson v. State, 209 Ala. 36, 95 So. 171; Bachelor v. State, 216 Ala. 356, 113 So. 67.
In Boyle v. State, 229 Ala. 212, 154 So. 575, a murder case, the assistant prosecutor argued, "That the effect of the finding of the defendant not guilty by reason of insanity would probably be to put him on the ground," and, "If you find this defendant not guilty by reason of insanity Dr. Partlow will be the man who will afterwards have to consider and pass upon the question of sanity." Counsel's objections to these comments were overruled.
Our Supreme Court held that reversible error was committed. We find the following language:
"Clearly the sole question in this connection was whether defendant was `not guilty by reason of insanity.'
"What might happen if he were sent to the insane asylum, instead of the penitentiary, should not have been thrown into the case to influence the verdict. The action of the trial court was an invitation to the jury to consider such contingency.
"Maybe the law should provide some greater safeguards, such as a judicial inquiry, *1101 before persons found not guilty of murder by reason of insanity should be discharged from the hospital for the insane; but this should not be allowed to influence juries in trials like this. State v. Johnson, 151 La. 625, 92 So. 139.
"Without considering further questions raised on the trial, the court is of opinion this conviction should not stand."
Boyle, supra, has been followed in Wise v. State, 251 Ala. 660, 38 So.2d 553, a capital case, and in Dunn v. State, 277 Ala. 39, 166 So.2d 878.
Subsequently, our Supreme Court has held that because of the cumulative effect of remarks of the prosecutor during closing argument, the resulting error could not be eradicated by the rulings and instructions of the trial court. Allred v. State, 291 Ala. 34, 277 So.2d 339.
The prosecutor's remarks in Allred, supra, are set out below:
"Statement No. 1.
"`And what did they do up at Bryce Institute? Of course, she went up to Bryce and they certified that in their opinion, or opinions, that she was insane. But what did they do with her? They kept her there from February until August and then put her back down here on us.'"
"Statement No. 2.
"`Mr. White: . . . There's no way on earth, within good conscience, that you can find that this woman is not guilty by reason of insanity on that day. And let her back out to walk the streets of this county and any other county that she wants to go into and kill whoever else she wants to.'"
"Statement No. 3.
"`Mr. White: Okay. You all know how long she stayed in Bryce the last time. With that, I'll close. . .'"
Justice Jones, writing for the Supreme Court, held that the case must be reversed, stating:
"In answering the question before us, we cannot analyze each statement separately to see whether, if standing alone, if would create an ineradicable bias or prejudice; but rather they must be considered together to determine whether or not, in their cumulative effect, they created a prejudicial atmosphere incapable of eradicability. Blue v. State, 246 Ala. 73, 19 So.2d 11; Kabase v. State, 244 Ala. 182, 12 So.2d 766.
"It is a general rule that where prejudicial statements are made in the heat of argument, even though improper, in accommodation of our adversary system, such statements are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both. Dunn v. State, supra. See also Arant v. State, 232 Ala. 275, 167 So. 540. But our cases also recognize that an exception to this rule exists were, irrespective of the best efforts of the trial judge to disabuse the mind of the jury of any prejudicial impression, the conviction obtained is not in an impartial atmosphere. Blue v. State, supra. See also Pointer v. State, 24 Ala.App. 23, 129 So. 787; DuBose v. State, 148 Ala. 560, 42 So. 862."
The last affirmation of the above case law by our Supreme Court appears in Christian v. State, Ala., 351 So.2d 623, reversing this Court's decision at Ala.Cr.App., 351 So.2d 616. In that case the prosecutor made the following remarks:
"`1. They are (Bryce Hospital) saying that he was insane then but is probably competent to walk the streets of Tuscaloosa today.
"`2. But let me remind you that when he was released in 1971 he was ruled competent to live among normal people, and the next year he murdered his mother.
"`3. Ladies and gentlemen, I live in this town (Tuscaloosa) and you know what our problems are.
"`4. If you return a verdict of not guilty by reason of insanity against this man, this means this man is scott freefree to walk the streets of Tuscaloosa again."
The State contended that, assuming the remarks were prejudicial, any error was cured by the following jury instruction:
*1102 "`Now, on the other hand, ladies and gentlemen, if you analyze the evidence in this case that has been presented to you and you are reasonably satisfied that at the time of the commission of the act charged that this defendant was legally insane as I have defined it to you, it would be your duty to find him not guilty by reason of insanity and then the matter would further actually be up to the Court.'" (Emphasis supplied).
The Supreme Court first noted that such argument was improper under their previous decisions in Allred, supra; Dunn, supra; Boyle, supra; and Anderson, supra. In conclusion they held that the closing argument of the prosecution constituted ineradicable error which was not cured by the instruction given the jury.
In the case at bar the State argues that the prosecutor's remarks were a reply in kind to a portion of defense counsel's closing argument. From the record:
"And the second one I asked him to read to you is this: `I charge you that under the law of Alabama, the Court will decide what will happen to the Defendant if you find him not guilty by reason of insanity.' `The Court will decide what will happen to the Defendant if you find him not guilty by reason of insanity.'"
This precise assertion was made by the State in Dunn, supra. We quote the Supreme Court's reply.
"We have given careful consideration to the argument of counsel for the appellant and we find no remarks therein which would justify the argument of the solicitor on the ground that it was in answer to argument made by opposing counsel. One of the lawyers for appellant in his argument did summarize the provisions of § 429, Title 15, Code 1940, which section reads:
"`When a person has escaped indictment, or been acquitted of a criminal charge on the ground of insanity, the court, being informed by the jury, or otherwise, of the fact, must carefully inquire and ascertain whether his insanity in any degree continues, and, if it does, shall order him in safe custody, and to be sent to the Alabama state hospitals.'
"The reference to the provisions of the quoted statute did not, in our opinion, operate to justify the statements of the solicitor to which objections were interposed and overruled."
Here, as in the above cited cases, the sole issue for the jury was appellant's responsibility at the time the offense was committed. Prior to trial the prosecutor was warned to stay clear of this line of argument. However, a review of the prosecutor's actions reveals that he repeatedly interjected this issue in the case before the jury, in disregard of the trial court's instruction and well established law. Indeed, in the prosecutor's own words, referring to questions asked of Dr. Skinner, ". . . I asked the question . . . so that I could . . . `inform' them, and it was the jury, that Searcy Hospital does not keep sane people in there, in essence."
In essence, this was highly improper. Because of the prosecutor's prejudicial and reckless remarks this Court has no alternative but to reverse this case under the mandate of the decisions of our Supreme Court.
There is another glaring error which requires a reversal. The jury returned the following verdict:
"We, the jury, find the defendant guilty of capital murder as charged in the indictment and fix his punishment at death by electrocution.
 /s/ Vicki H. McGaha
 Forewoman"
Under Watters v. State, Ala., 369 So.2d 1272 (1979) and Cook v. State, Ala.Cr.App., 369 So.2d 1260, released by this Court today, there is a fatal variance between the indictment and the judgment. The judgment must be reversed and the cause remanded.
We have carefully read the transcript in this case consisting of twelve volumes and have examined all exhibits introduced by the State and appellant. Our view includes the written findings of the trial judge following the hearing on the *1103 aggravating and mitigating circumstances as provided by § 13-11-4, Code of Alabama 1975. The trial court fully complied with the cited section, and its findings and sentence are fully supported by the evidence.
This is one of the most horrible crimes to reach this Court in a long time. We do not know what demonic thoughts passed through the sadistic mind of appellant which compelled him to commit this atrocious rape and murder and the perversities inflicted upon his helpless victim. Only appellant could give such answers but he remained silent at the sentencing hearing.
It is with great reluctance that we are forced to reverse and remand this case due to the prejudicial remarks of the prosecuting attorney in closing argument and the variance between the indictment and judgment, but we are left with no other choice.
REVERSED AND REMANDED.
All the Judges concur, except BOOKOUT, J., who concurs specially with opinion.
BOOKOUT, Judge, concurring specially:
When certain statements of the prosecutor are isolated and quoted out of context, they may appear to have had a more prejudicial effect than they actually did. In the instant case, the appellant's sanity was a hotly contested issue. He had been examined by competent experts in the field of psychiatry and psychology. Expert witnesses were examined and cross-examined during the course of the trial concerning the appellant's sanity. Lengthy arguments were made by defense counsel in an effort to convince the jury that the appellant was in fact insane, while the State attempted to show that the appellant was legally sane at the time he committed the crime.
The majority, in its opinion, sets out certain excerpts from the record to show the cumulative effect of prejudicial remarks of the prosecutor. I take a different view of the prosecutor's remarks in this particular case.
A portion of the State's examination of Dr. Skinner is set out above in the majority opinion. In that colloquy it shows that persons retained at Searcy Hospital are considered insane and that persons who are considered to be sane are not kept there, but are returned to "proper places." Dr. Skinner expressed an opinion that the appellant was sane. No objection by the appellant was made to the question propounded or answer given during the course of that colloquy. The prosecutor was merely pointing out to the jury that the appellant, after having been examined at Searcy Hospital, was found to be sane, otherwise he would have been retained there.
Later, defense counsel took the witness stand outside the presence of the jury and testified as to a television interview given by the prosecutor. Counsel for the defense stated that the prosecutor made a statement to the interviewer that if a person is found to be sane "that they'll get out later on the public, something to that effect." (Emphasis supplied.) The prosecutor then took the stand and stated that he did not remember "word-for-word" what he said at the interview, but that he had questioned Dr. Skinner in such a manner as to inform the jury "that Searcy Hospital does not keep sane people in there in essence." The jury did not see the interview.
It is apparent that part of the prosecutor's strategy in this regard was to point out the sanity of the appellant, i. e. had he been insane, he would still be in Searcy Hospital. A portion of the prosecutor's later argument is along the same line:
". . . He was sent to Searcy Hospital and evaluated by two psychologists and three psychiatrists. One out of five said he thought the man was insane at the very moment he killed Cheryl Payton. The other four said he was sane."
The prosecutor's strategy in examining Dr. Skinner, as well as his argument that Searcy Hospital does not keep sane people incarcerated, would appear to be a legitimate argument to support the State's position that the appellant was sane and therefore responsible for his criminal actions.
The majority further quotes from the prosecutor's closing argument to the jury. That excerpt was taken out of context. It actually begins as a reply to comments *1104 made earlier by defense counsel. To put it in proper perspective, I will quote a portion of those comments from the record underlining the part omitted by the majority opinion:
"Mr. Dees [defense counsel] says that we used to take people out and shackle them; crazy people out and shackle them in the wilderness. Tie their hand off and leave them out there. And he said that we are sophisticated today. We send insane people to institutions. Did you hear that? We send insane people to institutions. Insane people to institutions. This man is sane. We are not sending any insane person to an institution. He is sane. And he [defense counsel] says the Judge has the authoritywhich he does by lawto determine what to do with the Defendant if you happen to find him not guilty by reason of insanity, but I can't see how you can. I will argue to you that the law is that they've got to discharge someone at Searcy Hospital"
At that point, defense counsel made a general objection and requested to approach the bench, at which time a discussion was held at the bench off the record. No grounds for objection are stated in the record, and no ruling by the trial judge is found at this point. The district attorney then resumed his argument. Again, only a portion of the argument is set out in the majority opinion. I must strongly point out that no objection by defense counsel was made to that portion of the oral argument quoted in the majority opinion. It was later in the argument that defense counsel stated: "Your Honor, I object. If this jury finds this man guilty, they have to sentence him to death. I don't understand this line of argument. It's improper." The court then stated: "I'll sustain the objection. I'll charge the jury in the morning." Therefore, when an objection was made the court ruled in favor of the appellant, and the court did give an extensive charge to the jury the next day.
The one comment which appears to concern this court more than any other was: "They are not going to take a sane man if you say that he is innocent. If you say that he is not guilty by reason of insanity, the Judge then has to do his duty." Aside from their being no objection at that time and there being a ruling favorable to the appellant on the later objection, it appears that this latter argument of the prosecutor could reasonably be considered as a reply in kind to an earlier argument made by the defense. In referring to written requested charges made by defense counsel and submitted to the trial court, he argued to the jury:
"And the second one I asked him to read to you is this: "I charge you that under the laws of Alabama, the Court will decide what will happen to the Defendant if you find him not guilty by reason of insanity.' `The Court will decide what will happen to the Defendant if you find him not guilty by reason of insanity.'"
Therefore, the prosecutor's later argument that "if you say that he is not guilty by reason of insanity, the Judge then has to do his duty" is no more or no less that which the defense attorney had earlier requested the trial court to charge the jury and had himself argued to the jury.
The comments of the prosecutor complained of in the majority opinion do not anywhere reach the degree of prejudicial effect of the comments in Allred, supra, Christian, supra, and other cases cited by the majority. In Allred the prosecutor told the jury that if they found the defendant not guilty by reason of insanity, she would be "back out to walk the streets of this county and any other county that she wants to go into and kill whoever else she wants to." In Christian the prosecutor reminded the jury that the defendant had been released from Bryce Hospital earlier and had murdered his mother the following year. He then went on to tell the jury that a verdict of not guilty by reason of insanity would mean "this man is scott freefree to walk the streets of Tuscaloosa again."
In Dunn, supra, the Alabama Supreme Court did not find an argument on behalf of the defendant which would justify the later argument of the prosecutor. In that case the Court found that one of the defense attorneys had summarized the provisions *1105 of Title 15, § 429, Code of Ala. 1940, during argument. The Supreme Court held that summarizing that Code section was not justification for the prosecutor later stating: "Now, I further think, and think you as men of good common sense know, that if you sent this defendant as an insane man up to Tuscaloosa, the State mental institution, he wouldn't stay up there more than ten days. That is my opinion." Then, after a warning by the trial judge, the prosecutor again stated: "Well, I will say, in my opinion, they wouldn't keep him up there."
In the instant case, I do not take the prosecutor's comments as informing the jury that if they find the appellant not guilty by reason of insanity that he would not be kept in the State mental institution and would be free to walk the streets again and kill at will.
I consider the prosecutor's comments as legitimate argument on the issue of the appellant's sanity and a legitimate reply in kind to arguments made by defense counsel. The trial court sustained the appellant's objection to the line of argument which drew the most emphasis in the majority opinion. When the objection was sustained, any error was cured. Dunn, supra.
We have often quoted from Arant v. State, 232 Ala. 275, 280, 167 So. 540, 544 (1936) that: "[W]e must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair." I therefore believe that the prosecutor's remarks, though hard hitting, did not constitute error necessitating a new trial when considered in context, in light of the arguments advanced by defense counsel, and in light of the trial court's comprehensive charge to the jury.
If this cause is reversible, it should be based not upon the conduct of the prosecutor, but upon error spelled out in two recent cases by our Supreme Court.
In the instant case, the appellant was indicted for the crime of "rape when the victim is intentionally killed by the defendant." (Emphasis supplied.) (Section 13-11-2(a)(3), Code of Ala. 1975) The trial judge charged the jury that if they found the appellant guilty, the form of their verdict would be: "We, the jury find the Defendant guilty of murder as charged in the indictment and fix the punishment at death." (Emphasis supplied.) That was an improper instruction, but no exception was taken by the defense.
The jury, however, returned a guilty verdict in another form: "We, the jury, find the Defendant guilty of capital murder as charged in the indictment and fix his punishment at death by electrocution." (Emphasis supplied.)
In Clements v. State, Ala., 370 So.2d 723 (1979), the appellant was indicted for "robbery. . . when the victim is intentionally killed by the defendant." (Section 13-11-2(a)(2), Code of Ala. 1975) After an erroneous charge by the trial court, the jury returned a verdict of "guilty of first degree murder with aggravated circumstances." (Emphasis supplied.) The Alabama Supreme Court reversed that conviction and death sentence because the jury found that appellant guilty of an offense not charged in the indictment.
In Watters v. State, Ala., 369 So.2d 1272 (1979), the appellant was likewise indicted for robbery when the "victim is intentionally killed by the defendant," and the jury there likewise found him guilty of murder, and judgment was entered as "guilty of capital murder." (Emphasis supplied.) Again, the Supreme Court found a fatal variance between the indictment and judgment.
Based on the mandate of Watters, this court this date has reversed and remanded Cook v. State, (after remandment to us by that Court with directions, Cook v. State, Ala., 369 So.2d 1251 [Opinion corrected February 9,1979]). In Cook, we found that the appellant was also indicted for capital robbery, but convicted of "murder in the first degree."
Since the instant appellant was charged with "rape when the victim is intentionally killed by the defendant," but was found guilty of "capital murder," the case should be remanded for a new trial solely on that basis as mandated by the Supreme Court opinions in Clements and Watters, supra.
NOTES
[1] The record reveals there was no mutilation on the body of one of the previous victims. He had gone into a compact store, shot and killed a woman clerk, left the store and not returned to the murder scene.